# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 7, 2022 Session

## STATE OF TENNESSEE v. ZACHARY RYE ADAMS

**Appeal from the Circuit Court for Hardin County**
**No. 17-CR-10      C. Creed McGinley, Judge**

---

### No. W2020-01208-CCA-R3-CD

---

The Defendant, Zachary Rye Adams, was convicted of first degree premeditated murder; two counts of first degree felony murder; two counts of especially aggravated kidnapping, a Class A felony; and three counts of aggravated rape, a Class A felony, by a Hardin County Circuit Court jury after a change of venue. *See* T.C.A. §§ 39-13-202 (2018) (subsequently amended) (first degree murder); 39-13-305 (2018) (especially aggravated kidnapping); 39-13-502 (2018) (subsequently amended) (aggravated rape). The State sought the death penalty. However, after the jury returned guilty verdicts, the parties agreed to consecutive sentences of life imprisonment without the possibility of parole for first degree murder, twenty-five years for especially aggravated kidnapping, and twenty-five years for aggravated rape, for an effective sentence of life imprisonment without the possibility of parole plus fifty years. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) the trial court erred by denying a motion to recuse, (3) the trial court erred by granting the State's motion to disqualify an attorney from the defense team, (4) the trial court erred by admitting evidence in violation of Tennessee Rule of Evidence 404(b), (5) the trial court erred by excluding a prior inconsistent statement, (6) the trial court erred by admitting hearsay evidence, (7) the trial court erred by excluding impeachment evidence, (8) the trial court erred by excluding "witness reactive conduct evidence," (9) the trial court erred by failing to strike testimony from an undisclosed witness, and (10) the cumulative error doctrine entitles him to relief. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Jennifer Lynn Thompson (on appeal and at trial), Nashville, Tennessee; James Simmons (at trial), Hendersonville, Tennessee; and Jerry Gonzales (at trial), Murfreesboro, Tennessee, for the appellant, Zachary Rye Adams.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Jennifer Nichols, Deputy District Attorney General Pro Tempore; and Eric N. Christensen, Paul J. Hagerman, and Stephen W. Ragland, Assistant District Attorneys General Pro Tempore, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to the April 13, 2011 kidnapping, rape, and murder of H.B.[1]  On September 7, 2014, more than three years after the victim's disappearance, a portion of the victim's skeletal remains were discovered near Natchez Trace State Park.  On May 19, 2015, the Decatur County Grand Jury indicted the Defendant, Jason Wayne Autry, and John Dylan Adams for first degree premeditated murder, first degree felony murder committed during the commission of a kidnapping, first degree felony murder committed during the commission of a rape, two counts of especially aggravated kidnapping, and three counts of aggravated rape.  On March 1, 2017, the trial court granted the Defendant's motion for a change of venue.  On June 22, 2017, the State provided notice, in relevant part, of an immunity agreement with Shayne Austin, who had not been indicted for his role in the offenses.  Evidence showed that the immunity agreement was later rescinded by the State and that Mr. Austin died by suicide on February 23, 2015.  The State likewise provided notice of an immunity agreement between federal authorities and codefendant Autry.  The State and codefendant Autry did not enter into an immunity agreement but agreed to discuss reduced charges after codefendant Autry's testimony at the Defendant's trial.  We glean from the record that codefendant John Dylan Adams, the Defendant's brother, pleaded guilty to offenses in a separate proceeding.  On September 9, 2017, the Defendant's trial began in the Hardin County Circuit Court.

### State's Proof

The victim's father testified that in 2011, the victim and her brother lived at home with him and his wife.  The victim's brother worked and attended school to become a social worker, and the victim attended nursing school.  Drew Scott was the victim's boyfriend at the time of her disappearance.

On April 13, 2011, the victim's father awoke around 5:30 a.m. to get ready for work and saw the victim's bedroom light on after he took a shower.  Although he did not open the victim's bedroom door, he asked her if she needed lunch money.  The victim said she needed money, and he left twenty dollars in the kitchen when he left for work.  Sometime

---

[1] It is the policy of this court to refer to victims of sexual crimes by their initials.

that morning, he received a telephone call from Terri Brumley, who informed him the victim "had been taken." The victim's father returned home to find fifty to 100 civilians, local police officers, a swat team, and agents from the Tennessee Bureau of Investigation (TBI), the Federal Bureau of Investigation (FBI), and the United States Marshal Service. He recalled that a helicopter circled their twenty-three-acre property. He noticed that the victim's car was parked in the detached garage and that there appeared to be blood on the garage floor near the front of the victim's car.[2] DNA analysis later confirmed that the blood contained the victim's DNA. The victim's father roped off the garage and told law enforcement, who asked everyone to leave the property. The victim's parents and brother spent the next seven to eight weeks searching for the victim.

Drew Scott and the victim were dating at the time of the victim's disappearance, and he had given the victim a "promise ring." The victim wore the ring, and he identified the ring recovered during the investigation. A photograph of the ring was received as an exhibit. In the early morning hours of April 13, 2011, Mr. Scott and his father went turkey hunting on the victim's grandmother's property, which was about twenty to twenty-five miles from the victim's home. Mr. Scott said he received the last text message from the victim shortly before 8:00 a.m.

James Barnes and the victim's family were next door neighbors, and Mr. Barnes was home around 7:45 to 7:50 a.m. on the morning of the victim's disappearance. Mr. Barnes heard "arguing" coming from the victim's home. Although he could not see anyone, he heard the victim "screaming a little and then she quit," and she "kind of cut out mid-scream." He heard the victim say, "Stop. I said stop." He did not initially consider the arguing serious, but his "hair stood up everywhere." Mr. Barnes recalled that his dogs barked, lay their ears backward, and cowered and that he walked to the tree line to see what was happening. He could not see anything and heard nothing else coming from the property. Mr. Barnes, his then-wife, and his young stepson began to leave home for the day, but he stopped his black truck at the end of the driveway for a few minutes. He turned slightly into the victim's driveway, parked, and turned off the engine for two to three minutes. He did not see any vehicles or hear anything, and he left. Mr. Barnes felt uneasy, called his mother, which cell phone records showed was at 7:47 a.m., and asked his mother to call the victim's mother. He received a telephone call later that morning from the TBI, requesting he return home for an interview. Mr. Barnes acknowledged that he became a "prime suspect" but did not know the reason, that he was questioned extensively and frequently by the FBI and the TBI, that his property was searched, and that the TBI "continually came around [his] house to attempt to get [him] to confess."

---

[2] The witnesses describe this location as a detached garage and as a carport. We use garage for consistency.

The victim's mother testified that on the morning of the offenses, the victim was in her bedroom studying and that everything was normal. The victim sat at the dining room table studying when the victim's mother left for work around 7:00 a.m. During her twenty-five-minute drive to work at an elementary school, the victim's mother spoke twice to the victim on the telephone, and they discussed Mr. Scott's turkey hunting on the victim's grandmother's property. The victim's mother arrived at work before 8:00 a.m., but not long afterward, the school secretary delivered a message, which stated that a neighbor heard screams coming from her home. The victim's mother was panicked and called her son, who reported seeing the victim outside with Mr. Scott. The victim's mother stated, "That's not [Mr. Scott]. Call all the neighbors." Afterward, she attempted to call 9-1-1 but was connected to an adjoining county's dispatcher. She called the victim's brother again, and told him to "get a gun and shoot him" because the man was not Mr. Scott. Terri Brumley, a friend and colleague, drove the victim's mother home, and she used Ms. Brumley's cell phone to call 9-1-1, contacting the Decatur County dispatcher. The recording of the 9-1-1 call was received as an exhibit and played for the jury.

The victim's mother testified that law enforcement prevented her from going to the rear of the home and into the woods to search for the victim. She and her family began searching for the victim and investigating tips from the public. They reported any information received to law enforcement. She, along with other people, spent the next year searching for the victim. The victim's mother's cell phone number was released to the public in order for anyone to report information. At an unspecified time, she received a telephone call from Ednesha Brasher, who had found a SIM card, which was later identified as the SIM card to the victim's cell phone. The victim's father and brother met Ms. Brasher, who gave the SIM card to the men, and they gave it to law enforcement on the same day.

The victim's mother identified photographs depicting the inside of her home on the day the victim disappeared. She likewise identified photographs of the garage and stated that the blood on the garage floor was not present when she left for work that morning. She provided law enforcement with a list of items contained in the victim's purse and a description of the clothes the victim wore, which included jeans, black Old Navy flipflops, and a pink Girly Girl shirt. The victim's mother identified a piece of paper dated April 13, 2011, which contained the victim's handwriting and was related to the victim's nursing classes. The victim's mother identified the victim's purse and lunchbox, which contained a sandwich the victim's mother made on the morning of the offenses. She identified the victim's camera, keys, and wallet, which contained multiple forms of the victim's identification, all of which had been inside the victim's purse on the morning of the offenses. The victim's mother had placed the twenty dollars left by her husband inside the

victim's wallet before leaving for work, but the money was gone. All of the items identified by the victim's mother were recovered during the investigation.

The victim's mother admitted that she investigated information she received and that in July 2011, she, her husband, and her son attempted to speak to the Defendant at his home but that he did not answer the door. They went to the Defendant's grandfather's home, which was located on the same property, and spoke to the Defendant's grandfather and codefendant Adams. The victim's mother left her contact information with codefendant Adams and instructed him to tell the Defendant that she wanted to speak to the Defendant. The Defendant called the victim's mother the next day and invited her to his home, and she and her son went to the Defendant's home. She recalled that the Defendant asked her son to describe the man her son saw walking with the victim toward the woods, that her son described the man, and that the Defendant said the description matched Shayne Austin. The Defendant told the victim's mother that he could call someone with his cell phone and make it look as though the call were coming from her phone, which she described as "spoofing." In addition to speaking to the Defendant and codefendant Adams, the victim's mother spoke to Mr. Austin and codefendant Autry.

The victim's brother testified that on April 13, 2011, he awoke around 7:40 a.m. to their family dog barking continuously and that although he attempted to return to sleep, he got out of bed to determine the reason for the barking. He looked out the windows overlooking the garage, and he heard a man's voice, which he described as deep and low, and the victim's voice coming from the garage. He raised the window blinds slightly and saw the silhouette of two people knelt down below the window. He initially thought the male voice belonged to Mr. Scott, the victim's boyfriend, because he was the only man in the victim's life other than himself and their father. The man sounded aggravated, and the victim sounded upset, although the victim's brother could not determine what they discussed. He listened to them for less than one minute before calling and sending his mother a text message because he thought the victim had school. The victim's brother received a telephone call from his mother, who stated that the victim had a test that day. He recalled that the victim's car was still parked in the garage, although he could not recall if he told his mother. He told his mother that the victim and Mr. Scott were in the garage, and his mother said, "That's not Drew. Call the neighbors." They ended the call, and the victim's brother looked out the kitchen door because he no longer heard voices. Across the backyard, he saw the man, who wore camouflage, and the victim, who wore jeans and a pink shirt, walking toward the woods, and the victim's brother noticed that the man was "wider and heavier, stockier" than Mr. Scott. The victim's brother thought the man could have been a cousin. The victim's brother said that just inside the woods was a sixty-yard trail leading to "an old logging road," which was drivable. He recalled that the man held a

-5-

black object in his hand that could have been a gun or a "deer grunt call" and that the man had dark hair long enough to touch a shirt collar.

The victim's brother received another phone call from his mother, who told him that the man was not Mr. Scott and to "[g]et a gun and shoot him." He declined to shoot the man because he still thought the man could have been Mr. Scott or a cousin and because he had not seen anything to indicate he needed to shoot anyone. The victim's brother said he was not awake fully, was confused, and was unsure what had happened. He dressed, grabbed a pistol and his cell phone, and planned to walk up the trail, but he looked to the left and saw blood on the garage floor. He still was unsure what had happened but did not think his sister had been abducted. He walked to the edge of the woods and listened for noises, but he did not hear anything. After about thirty seconds, he heard a truck, which was driven by Kathy Wise, Mr. Barnes's then-wife. Ms. Wise drove to the victim's home and asked the victim's brother what had happened because Mr. Barnes had heard screams fifteen to twenty-minutes before she arrived. At this time, the victim's brother called 9-1-1. He did not hear the screams.

The victim's brother did not know the Defendant, codefendant Autry, or Mr. Austin before the victim's disappearance but knew of codefendant Adams because codefendant Adams and the victim's brother's cousin were friends. The victim's brother described the man entering the woods with the victim as five feet, ten inches tall and 200 pounds. The victim's brother agreed that this description did not match the Defendant but said that it matched Mr. Austin. The victim's brother agreed that he had "heated conversations" with law enforcement officers, who were frustrated that he did not intervene and could not identify the man. He agreed that if he had more information at the time, he would have acted differently and intervened.

The TBI provided the victim's brother with various voice recordings in an effort to identify the voice he heard on the morning of the offenses. Two of the voice recordings sounded identical and were consistent with the voice he heard on the morning of the offenses. One voice belonged to Terry Britt, and the other belonged to a law enforcement officer. During the investigation, the victim's family hired an attorney, who accompanied the victim's brother during his subsequent police interviews, and he agreed that the police continuously accused him of lying, accused him of withholding information, and "put great pressure" on him to "change [his] story," which he described as pressure to provide additional information.

John Babb owned about 150 acres of property near the victim's home, and he knew the victim's family well. Mr. Babb and a friend arrived at his property at 7:30 a.m. on the day of the offenses intending to fish. While waiting to start the fishing trip, Mr. Babb heard

-6-

a motor revving and saw a white pickup truck moving extremely fast on the road on which the victim's home was located. Mr. Babb said that the truck had been about 150 to 200 yards from the victim's home. Before he saw the truck, Mr. Babb heard what he thought were "cats fighting" coming from the victim's property. Although he did not think at the time that the noises could have been crying or screaming, Mr. Babb thought it was possible.

On April 13, 2011, members from various law enforcement agencies arrived at the victim's home. When officers realized that the victim's purse and cell phone were not at the home, the victim's cell phone data was used to attempt to locate her. The victim's cell phone provider sent information every fifteen minutes to the Decatur County Sheriff's Department regarding the cell phone towers with which her phone communicated or "pinged." The phone pinged on two towers, and the information, which consisted of latitude and longitude coordinates within a two-mile radius, was relayed to law enforcement officers. The tower pings ended a few hours into the search. After the pings ended, Decatur County Sheriff's deputies were tasked with interviewing all of the sexual offenders living in the county. During this portion of the investigation, deputies did not speak to the Defendant, codefendants Adams and Autry, or Mr. Austin. However, deputies spoke to Mr. Britt.

Decatur County Sheriff's Deputy Tony Weber interviewed Mr. Britt, whose home was closer to the victim's home than the Defendant's home. Mr. Britt reported that he awoke at 6:00 a.m. and that he and his wife left home traveling to "Allgoods" in Camden to purchase items for a home improvement project. Deputy Weber recalled that when he arrived at the Britt home, Mr. and Ms. Britt were unloading a bathtub from a pickup truck. Deputy Weber was unsure if other deputies attempted to speak to Mr. Britt earlier in the day. During a search pursuant to a warrant of Mr. Britt's home, three cell phones, what appeared to be one blonde hair strand, and a photocopy of a page from a Scotts Hill yearbook showing a young woman's photograph were collected. Other evidence showed that the hair strand did not belong to the victim and that the woman depicted in the yearbook photograph was not the victim.

Tennessee Highway Patrol (THP) Trooper Warren Rainey spoke to the Defendant twice during the eighteen months the THP was involved in the investigation. Soon after the victim's disappearance, Trooper Rainey asked for the names of "people . . . who lived north of Parsons, who had been in trouble, drug user, sex offender, which I could look that up on the internet, which I did, and I would ask anyone and one of the names that came up was [the Defendant]." Trooper Rainey focused on the area north of Parsons based upon the cell phone data pings from the victim's cell phone and upon the locations where evidence was recovered throughout the investigation. He drove the routes between the victim's home and the locations where evidence was later recovered, which included a

credit card receipt with the victim's name, and the routes ended in the Yellow Springs and Holladay communities. Trooper Rainey's investigation led him to the Defendant's home, which was located north of Parsons, near Holladay, and not far from Yellow Springs Road.

Trooper Rainey, along with an unidentified trooper, went to the Defendant's home, and they spoke to the Defendant outside about the offenses. The Defendant denied any involvement in the offenses, but he appeared "scared" because he shook during the interview. Afterward, Trooper Rainey went next door to speak with the Defendant's grandfather, and then the troopers left. However, Trooper Rainey saw from the side mirror of his vehicle that the Defendant ran "wide open back to his house." When the troopers left, they drove away from the Defendant's home in opposite directions, and they stopped a short distance from the driveway leading to the Defendant's home. A few minutes later, Trooper Rainey saw codefendant Adams leaving the property and driving toward Parsons. Codefendant Adams was stopped by the police for reckless driving.

Trooper Rainey engaged in surveillance of the Defendant's house for an unspecified period of time. After learning that the Adams family property adjoined county-owned property, Trooper Rainey assembled a search team, which included police dogs and cadaver dogs, to search the area while he continued to watch the Defendant's home from a short distance. After speaking with the search team, Trooper Rainey returned to the Defendant's home and asked the Defendant and his grandfather for permission to look around the rear of the Defendant's home. Behind the Defendant's home, Trooper Rainey saw a mattress in good condition leaning against the home.

Although Trooper Rainey did not know the Defendant before this case, he focused on the Defendant because "his name had come up several times" when he "went around town asking who's the bad guy." Trooper Rainey knew the Defendant was involved with methamphetamine.

Stephen Young was a member of a six-person search team compiled by Trooper Rainey to search behind the Defendant's home. While Trooper Rainey spoke to the Defendant, Mr. Young and the other members hid in the woods behind the home, covering the outside perimeter of the home. Mr. Young and the others watched the Defendant's "movements" after Trooper Rainey left the home. Mr. Young saw the Defendant retrieve a vacuum from the garage and vacuum a black pickup truck, which was parked in a shed behind the home, for about one and one-half hours. While Mr. Young watched the Defendant, other members of the team searched for evidence. Mr. Young saw two mattresses leaning against the Defendant's home.

Dennis McKenzie, then-owner of McKenzie Tree Service where the victim's father worked at the time of the victim's disappearance, assisted in the search for the victim for several weeks. Mr. McKenzie was a member of the search team compiled by Trooper Rainey. Trooper Rainey spoke to the Defendant at the Defendant's home, while Mr. McKenzie and others waited in the woods behind the Defendant's home. After Trooper Rainey spoke to the Defendant, Mr. McKenzie saw the Defendant walk to a garage and vacuum a black pickup truck for ten to fifteen minutes. The Defendant stopped vacuuming the truck and walked to two mattresses leaning against the home and rinsed them off with a water hose for about five minutes. Afterward, the Defendant returned to vacuuming the truck.

FBI Special Agent Matthew Ross joined the search for the victim about one week after her disappearance. He, along with other members of various law enforcement agencies, interviewed the Defendant at the Defendant's home. During the interview, Agent Ross noticed scratches on the Defendant's arms and legs, and the Defendant consented to Agent Ross's taking photographs of the scratches. Photographs of the markings were received as exhibits and showed vertical linear markings on the "front inside part" of the Defendant's left arm, along with a round scab on the tricep. The Defendant explained that he suffered the scratch marks when he ran through the woods and a briar patch attempting to evade the police a few days before the victim's disappearance. Agent Ross agreed that the scratch marks were "reddish, pink lines," which did not have any scabs. He agreed that the markings looked like "pink-colored scars."

During the interview, the Defendant recounted what he had done the day of the victim's disappearance. The Defendant stated that he awoke around 10:00 or 10:30 a.m.; that nobody was home with him at this time; and that he, Mr. Austin, and codefendant Adams went to a convenience store. The Defendant stated that Rebecca Earp was his former girlfriend, and he consented to a search of his home and the crawl space, which did not appear recently disturbed.

On April 4, 2011, which was nine days before the victim's disappearance, Natchez Trace State Park Ranger Chris Hill conducted a traffic stop of a white pickup truck driven by the Defendant. During the stop, Mr. Hill saw a camouflage "fanny pack" inside the truck. When Mr. Hill picked up the pack, the Defendant grabbed the pack from Mr. Hill and ran through the woods, disposing of the items inside the pack. Mr. Hill chased the Defendant, shoved him to the ground, and arrested him. Mr. Hill recalled that the Defendant did not have linear markings on his left arm at this time. The Defendant's white pickup truck was impounded by the Henderson County Sheriff's Department and released one or two days later.

Christee Clenney lived in the same area as the victim's family. Approximately two weeks before the offenses, between 7:30 and 8:30 a.m., Ms. Clenney walked along the road from her home to the intersection with the road on which the victim's home was located. This area did not have much traffic, and the roads were narrow. When she reached the intersection, she heard a loud truck engine and saw a white, full-size pickup truck "idling on" the road less than one mile from the victim's home. She turned to walk toward her home and looked backward. The truck remained parked for a few seconds, which Ms. Clenney thought was "weird," but the truck slowly turned around twice. The truck moved slowly, and the driver asked if he had scared her, said he did not mean to scare her, and said he thought she was a girl he knew who lived in the area. The driver laughed slightly and drove away. Ms. Clenney said the driver was in his early to mid-twenties and had light brown hair. After she reported the incident to the police about one week after the victim's disappearance, a TBI agent showed her various photographs, but she could not identify anyone as the driver of the white truck. Ms. Clenney, along with her then-husband, went to the police station at a later date for her to look at additional photographs, and she identified a person whom she "thought" looked like the driver. She looked at additional photographs but continued returning to the photograph of the person she thought could have been the driver.

Timothy Clenney testified that he accompanied Ms. Clenney to the Decatur County Sheriff's Department in order for her to review various "mugshots." He recognized "almost everybody" in the photographs as a result of his previous employment as a teacher. He said that although Ms. Clenney did not identify anyone as the person she had seen in the white truck, she returned multiple times to the same photograph and said the person in this photograph "fits the description" of the man. Mr. Clenney recognized the person in the photograph as the Defendant. However, Mr. Clenney did not know that Ms. Clenney had previously identified Jonathan Martin as the driver of the white truck and had described the driver as being in his early to mid-twenties, having light brown hair, and weighing 180 to 190 pounds.

Rebecca Earp, the Defendant's former girlfriend, testified that around the time of the offenses, her relationship with the Defendant was difficult because of the Defendant's morphine and methamphetamine use and because of his "temper." They lived at the Defendant's home but she had attempted to end the relationship multiple times, including the day before the victim's disappearance. Ms. Earp had difficulty ending the relationship because the Defendant convinced her to stay and would be "very stern or threaten" her. The Defendant, codefendants Adams and Autry, and Mr. Austin socialized frequently. Mr. Austin used "pills" and lived close to the Defendant.

-10-

On the morning of the offenses, the Defendant woke Ms. Earp sometime between 6:00 a.m. and 7:30 a.m. and stated he was going to "haul off scrap." The Defendant left home, and Ms. Earp left the home to be at work in Parsons at a video rental and tanning salon at 9:00 a.m. The Defendant drove a white Nissan truck. Before she left for work, she left the Defendant a handwritten note asking him to put the laundry in the dryer when he arrived home. Other evidence showed that when she arrived at home, the clothes had not been moved to the dryer, that the Defendant told Ms. Earp that he had not been home to move the laundry to the dryer, and that the note Ms. Earp left had been torn and taped to a business card from a scrap metal business. Ms. Earp learned of the victim's disappearance sometime that morning. She knew the victim and the victim's cousin, N.B., because they were customers where Ms. Earp worked. Ms. Earp introduced N.B. to the Defendant. "Close to the afternoon," the Defendant came to see Ms. Earp at work, and they argued because she thought the Defendant lied about going to the "scrap yard" due to his "switch[ing] phones." The Defendant began using codefendant Adams's cell phone, which belonged to "Becky," to send text messages to Ms. Earp, which was unusual.[3] Ms. Earp said that during the argument, the Defendant "grabbed" her head. She recalled that he was driving his white truck at this time and that a trailer was not attached to the truck.

The day after the offenses, Ms. Earp, the Defendant, and Mr. Austin were at the Defendant's home watching news reports about the victim's disappearance. Mr. Austin "kind of smirked and started laughing," and the Defendant stated, "[T]hey'll never be able to find her." Ms. Earp saw three parallel scratches on the Defendant's neck, which the Defendant did not have when he left home the previous day. She described them as superficial scratches on the right side of the Defendant's neck extending from "under the jawline [at] the ear towards the Adam's Apple." She did not mention the scratches because she was scared. She told the defense investigator that the scratches were unrelated to the victim's disappearance and were sustained when the Defendant ran from a park ranger before the offenses. Ms. Earp said the Defendant always had scratches.

Ms. Earp ended her relationship with the Defendant in July 2011, three months after the victim's disappearance. When Ms. Earp left, she and the Defendant argued, and she attempted to get away from him. She said that the Defendant threatened to "tie [her] up just like he did [the victim]" and that he told her "nobody would ever see [Ms. Earp] again." Although Ms. Earp and the Defendant's romantic relationship ended, they continued to socialize. During the breakup, she moved a mattress out of the Defendant's home to her mother's home but returned the mattress to the Defendant's home. During this time, she overheard a conversation between the Defendant and John Mitchell, who was the Defendant's friend. She heard the Defendant say that "everything was ready to go in the

---

[3] Other evidence showed that Becky Adams was the Defendant's mother.

back of the truck to be put up under the Birdsong bridge." She recalled that the Defendant said, "Take the Tupperware – it was a blue Tupperware thing to Birdsong." She said, "They said it was the remains of [the victim]. But when they found out that I found out about it, they said it was the remnants of making meth" they were throwing away. She did not recall if it was the Defendant or Mr. Mitchell who mentioned the victim's remains. She said that later, Mr. Mitchell told her that the incident was a "joke to see if [she] would call the police."

After the Defendant's arrest, Ms. Earp became pregnant with her first child. She was interviewed by TBI Agent Valerie Trout, who threatened to take her child away and place the child in the custody of the Department of Children's Services if Ms. Earp did not tell the TBI everything Ms. Earp knew about the victim's disappearance. Ms. Earp agreed that she had given multiple inconsistent statements and that she used methamphetamine, marijuana, and Xanax at this time and was scared. In her initial statement, she did not provide any information implicating the Defendant, and she acknowledged the Defendant had sustained scratches when he was chased by a park ranger. In another statement, she said the Defendant was still home on the morning of the offenses when she left for work at 9:15 a.m. In another statement, she told the police that the Defendant and Victor Dinsmore hauled scrap metal on the morning of the offenses and that she did not know if the Defendant had spoken to Mr. Austin, who did not have a vehicle and who had suffered multiple trauma-related accidents. She admitted that she feared the Defendant and that he threatened her and her family if she spoke to the police.

Following the Defendant's arrest by the park ranger, Ms. Earp said that the Defendant's white truck, which was owned by his grandfather, was impounded and that his grandfather left the truck in the impound lot "for a while."

TBI agents interviewed Ms. Earp again sometime after the Defendant's arrest in this case. The agents provided her a document from Birdsong Auto Salvage, a scrap metal business at which a person could exchange metal for money. The document did not show that the Defendant exchanged scrap metal on April 13, 2011, and she admitted she became angry and thought the Defendant had been unfaithful. The TBI agents, however, did not tell her the records showed that the Defendant exchanged metal on April 11 and April 15. Ms. Earp said that the Defendant exchanged metal frequently as an income source.

Jon Graves owned property that was searched by people attempting to find the victim. On April 14, 2011, at 7:30 p.m., the day after the victim's disappearance, he assisted in the search by looking inside several barns on his property that were only accessible by an all-terrain vehicle. Although the searches of the barns were not fruitful,

Mr. Graves found what was later identified as the victim's lunchbox, which contained a sandwich, in a creek on his property.

Gerald Stephens owned a cattle and row-crop farm in the area. Two days after the victim's disappearance, Mr. Stephens searched for the victim by driving the roadways in the general vicinity. His search led him to the Yellow Springs community, where he found what was later identified as underwear that did not belong to the victim. Other evidence showed that Mr. Austin lived a short distance from where the underwear was found. About 300 to 400 feet from the underwear, Mr. Stephens found a "wadded up" piece of paper that reflected the victim's name, address, and handwriting.

Emily Pratt attended nursing school with the victim, and their families were related. Ms. Pratt's son was a deputy with the Decatur County Sheriff's Department at the time of the victim's disappearance. On April 24, 2011, Ms. Pratt and others participated in a search, in which the victim's cell phone was located. The phone was about five miles from the victim's home.

On May 2, 2011, several weeks after the victim's disappearance, Ednesha Brasher and her younger brother rode bicycles near the victim's home. Her brother found a cell phone SIM card while riding their bicycles. Later that night, she inserted the SIM card into her cell phone, and she listened to "voice messages" on the card. She thought the card might have belonged to the victim, and she ultimately provided it to the victim's father and brother.

Ernest "Larry" Stone, a ginseng hunter, and his cousin searched for ginseng on September 7, 2014, in Decatur County near a cell phone tower and near Natchez Trace State Park. While picking ginseng, he saw an upside-down bucket in the woods. Under the bucket Mr. Stone found a skull, which was later identified as belonging to the victim. Mr. Stone called law enforcement, who responded to the scene.

Members of the University of Tennessee Anthropology Department assisted law enforcement in the search for additional remains. During the search, the following items were recovered: a cloth strap to a purse; a purse, which contained what was later identified as the victim's keys, camera, mirror, and earring; an inhaler; a small purse containing pens, highlighters, lipstick, and a memory drive; Chapstick; chewing gum; a black hair tie; a ring; pink fabric; an earring; a lotion bottle; a wallet containing the victim's identification; the sole of a black flip flop; a single .308-caliber cartridge casing; a single .410 shotgun shell casing; and multiple teeth and bones, which were later identified as belonging to the victim through dental records and DNA analysis. Some of the items reflected animal markings, and a forensic examination of the skull reflected a single gunshot wound to the

-13-

back of the head, resulting in skull fractures consistent with a close "range of fire," although distance was indeterminant. The wound was consistent with a .36-caliber bullet or smaller, including a .32-caliber bullet. The cause of death was a gunshot wound to the head, and the manner of death was homicide.

Codefendant Jason Autry testified that he grew up in the Parsons area and that his family lived there. He conceded he had served time in prison on three previous occasions after obtaining convictions for theft and drugs. He admitted that at the time of the victim's disappearance, he used morphine, methamphetamine, and hydrocodone. He, the Defendant, and codefendant Adams had known each other for years, and the Defendant's late father had been a "drug connection" for codefendant Autry. Mr. Austin and codefendant Autry were cousins.

Codefendant Autry testified that on April 13, 2011, his then-girlfriend drove him to his PT Cruiser, which had been parked at a convenience store overnight. At 8:00 a.m., he began calling the Defendant and Mr. Austin in an effort to obtain morphine. Around 8:40 or 8:50 a.m., codefendant Autry received a telephone call from the Defendant, who reported that he was busy and that he would call back when "he got to a location." The Defendant called codefendant Autry again and stated that he was at Mr. Austin's home and that he needed codefendant Autry's assistance. Codefendant Autry thought the Defendant needed assistance with making methamphetamine. When codefendant Autry arrived at Mr. Austin's home around 9:00 a.m., he saw a large fire in a "burn barrel," codefendant Adams "standing in the doorway with his shirt off," and the Defendant standing at the door of the Defendant's white truck. Mr. Austin, who had a pistol holstered to his side, told everyone to "hurry up and get the . . . h--- out of here" because someone was coming to the home to install a satellite system. Codefendant Autry bought morphine from Mr. Austin, returned to his PT Cruiser, and "shot" the morphine. Approximately ten minutes later, codefendant Autry left his vehicle and walked to the Defendant, who stood at the Defendant's truck. Codefendant Autry said that the Defendant stated, "I need you to help me bury this body." Codefendant Autry saw the body wrapped in a blanket or quilt and assumed that it was "little Joe," but the Defendant told codefendant Autry that it was the victim. Codefendant Autry was "clueless" because he did not know the victim, and he admitted that he did not care who was dead and that he was willing to help the Defendant. While the Defendant and codefendant Autry spoke, Mr. Austin continued to burn "stuff" in the barrel, and codefendant Adams stayed inside Mr. Austin's home. Codefendant Autry recalled that the smell coming from the burn barrel was reminiscent of "camp fuel and meth" and that there was a large blaze.

-14-

Codefendant Autry testified that the victim was wrapped in a multicolored, farm-style blanket and lay against the back of the truck. Codefendant Autry left his vehicle at Yellow Springs Church, about one mile from Mr. Austin's home, and the Defendant picked him up. As the Defendant drove, codefendant Autry noticed a pistol inside the truck but the absence of shovels that would have been necessary for burying a body. Mr. Autry suggested they place her body in the Tennessee River under the Interstate 40 bridge. Codefendant Autry said that the plan was to "gut her" to facilitate sinking and place the victim's body "in the deep end of the slew," which he said was inside the "federal refuge." Between 9:40 and 10:00 a.m., the Defendant backed up his truck and stopped at a pile of large limestone rocks close to the bridge. The Defendant and codefendant Autry removed the victim's body from the truck bed and lay the victim on the limestone rocks. Codefendant Autry noticed a small amount of blood in the truck bed after the victim was removed and a small amount of blood about the size of an orange on the blanket near the victim's torso. Codefendant Autry never unwrapped the blanket. The Defendant walked to the driver's side of the truck, while codefendant Autry stood over the victim. Codefendant Autry saw the victim's foot move and heard "a sound of distress," which he described as "hmm," coming from the victim. Codefendant Autry informed the Defendant that the victim was still alive and expressed his concern that the victim heard his name and voice. The Defendant had "a dead look" and was silent. From the truck, the Defendant retrieved the pistol that codefendant Autry had previously seen holstered to Mr. Austin's side. Codefendant Autry acted as a lookout to determine if anyone was coming to the area and advised the Defendant that "the coast was clear." At this time, the Defendant shot the victim once. Afterward, the Defendant and Mr. Autry heard a boat motor, and as a result, they loaded the victim into the truck and left the area. Codefendant Autry noticed that the blood on the victim's torso was the size of a grapefruit. They were there for less than one hour.

The Defendant drove codefendant Autry to his vehicle in order for him to meet his then-girlfriend for lunch, which was their usual routine. During the drive, codefendant Autry asked the Defendant how the victim came to be with the Defendant and how the Defendant knew the victim. The Defendant stated that the victim's cousin, N.B., worked at a gentleman's club and had a sexual relationship with the Defendant and that N.B. gave the Defendant the impression that he would have a sexual encounter with both women. The Defendant likewise stated that the victim had been to the Defendant's home previously. After the Defendant dropped off codefendant Autry at the church, codefendant Autry saw that the Defendant returned to Mr. Austin's home.

Later that afternoon, around 2:15 p.m., codefendant Autry called the Defendant to purchase additional morphine. Codefendant Autry arrived at the Defendant's home around 2:30 p.m. and noticed that the Defendant's white truck was not there. Codefendant Autry

recalled that the "area was just thick with animosity" and that there had been fighting and anger among the Defendant, codefendant Adams, and Mr. Austin, all of whom stood beside codefendant Adams's truck. Codefendant Autry stated that he and the three men got in codefendant Adams's truck and drove to Dottie Cooley's home, about two miles away, to meet Victor Dinsmore, who had morphine for sale. During the drive, the Defendant and Mr. Austin argued. Codefendant Autry said Mr. Austin told the Defendant, "[Y]ou didn't have to kill her." The Defendant responded to Mr. Austin, "[Y]ou're just as d--- guilty, you hit it," "[Y]ou shut your f------ mouth. I am sick of it being discussed," and "I'll whoop your . . . a--." Codefendant Autry explained that "hit it" meant to have sexual intercourse. After they arrived at Ms. Cooley's home, everyone but codefendant Adams got out of the truck. Outside the truck, the Defendant struck Mr. Austin. Codefendant Autry said that Mr. Dinsmore and an unidentified woman came from Ms. Cooley's home, and the fight ended. Mr. Austin returned to the truck, codefendant Autry purchased morphine, and the Defendant told Mr. Dinsmore that the Defendant "moved four rims in your shop to get my truck in." The four men left and returned to the Defendant's home. Codefendant Autry left to meet his then-girlfriend.

Codefendant Autry next saw the Defendant and codefendant Adams two days later, on April 15, 2011. The Defendant called codefendant Autry, and the three men met in a wooded area about one-fourth mile from a convenience store located about one mile from the Defendant's home. The Defendant and codefendant Adams were in codefendant Adams's truck. Codefendant Autry grew marijuana plants in the wooded area. The Defendant entered codefendant Autry's PT Cruiser, and codefendant Autry handed the Defendant a "meth pipe." Codefendant Autry asked the Defendant what the Defendant did with the victim, and the Defendant responded, "[W]e threw her out near Kelly Ridge," which he described as a large wooded area. The Defendant explained that he wanted to speak with codefendant Autry about codefendant Adams. The Defendant stated, "[Codefendant Adams] hadn't been to bed, won't stop running his d--- mouth about this s---. He's going to get us in trouble." Codefendant Autry asked the Defendant "what he wanted done," and the Defendant responded that his grandfather would pass away in a few years and that if codefendant Autry killed codefendant Adams, the Defendant would give codefendant Autry a "portion of the money and let [him] live in one of the houses." Codefendant Autry said he told the Defendant that he would think about it. Codefendant Autry said he told the Defendant that if he decided to do what the Defendant had asked, he would probably kill the Defendant, too. Codefendant Autry explained that he called the Defendant on the day of the murder for drugs and that when the Defendant asked for his assistance, the Defendant should have mentioned a "dead body" before pulling him "into the situation." While sitting inside codefendant Autry's PT Cruiser, codefendant Autry asked about Mr. Austin, and the Defendant said he had not seen Mr. Austin.

-16-

Codefendant Autry left the Defendant and drove to Mr. Austin's home. When he arrived, Mr. Austin was "highly inebriated," was frantic, and told codefendant Autry to leave. Codefendant Autry "took him away from the situation," noting that search parties were around the home and that a command post was not far away. Codefendant Autry said that he and Mr. Austin left in codefendant Autry's PT Cruiser and went to a restaurant. Codefendant Autry and Mr. Austin did not discuss the victim.

Codefendant Autry testified that, at an unspecified time, he called the Defendant and accepted the offer to kill codefendant Adams. Codefendant Autry surprised codefendant Adams at home and "lured" codefendant Adams into going fishing on the Tennessee River with marijuana. They arrived at the river and began fishing, but another fisherman, who knew the Defendant and codefendant Adams's grandfather, came up to them and asked if they were catching any fish. The fisherman also knew the person from whom codefendant Autry bought the boat they were using that day. Codefendant Adams said that, as a result, he abandoned his plan to kill codefendant Adams and that they continued fishing and drank alcohol. Codefendant Autry said that codefendant Adams became intoxicated and began to talk about the day of the offenses. Codefendant Adams said that based upon their conversation, he went to his and Mr. Austin's late grandmother's barn on Yellow Springs Road. Codefendant Autry said that he went to the barn "some months" after the offenses to "clean up any possible evidence left behind" but that he did not see any evidence.

In August 2012, codefendant Autry and the Defendant spoke about the victim while sitting on a bank and smoking methamphetamine. Codefendant Autry said to the Defendant that it "looks like we got by with this s---," which he said referred to the kidnapping, rape, and murder of the victim. Codefendant Autry said the Defendant responded that "the real reason that we were there was to show [the victim's brother] how to manufacture meth. . . . We got there early. She come [sic] outside screaming and raising h---, and we took her." Codefendant Autry said the Defendant stated that he raped the victim, that he described it as "a brief encounter," and that Brian Vitt was mowing the yard. Codefendant Autry said that he asked the Defendant how someone prepared to rape someone with two other men and that the Defendant responded that codefendant Adams performed oral sex on "them" to facilitate an erection. Codefendant Autry stated that the Defendant admitted he, codefendant Adams, and Mr. Austin raped the victim. Codefendant Autry said that the Defendant did not discuss how the men gained control of the victim.

Codefendant Autry testified that the pistol he saw holstered to Mr. Austin on the day of the offenses was the same pistol used by the Defendant to shoot the victim and was the same handgun recovered during the police investigation. Codefendant Autry stated

that four or five months after the offenses, Mr. Austin traded the handgun to Mr. Dinsmore for morphine.

About one week after the offenses, codefendant Autry drove past Kelly Ridge and saw buzzards sitting near a pond bank, and he thought the victim's body might have been there, after thinking about what the Defendant had said two days after the offenses. He equated the buzzards' presence with "something dead." As a result, he said that he went to the home of the property owner and asked for permission to fish in the pond but that the owner declined. Codefendant Autry left the property.

Codefendant Autry testified that he initially denied any involvement in the offenses and knowing the responsible parties. He said that he proclaimed his innocence frequently and that he wrote letters stating he did not kidnap, rape, and kill the victim. He said that although he did not commit those offenses, he lied about not knowing anything about the offenses. He said, though, that he told his initial attorneys at his first court date he had information about the offenses but that counsel did nothing. However, after his present attorneys were appointed in 2015, codefendant Autry, his attorneys, and the assistant district attorneys general met under the bridge, and he told everyone what happened to the victim while in his presence. He said that he was "hoping for leniency."

Codefendant Autry did not dispute cell phone records showing that he was near the Tennessee River location on April 11, 2012, at 9:55 a.m., April 14, between 6:44 p.m. and 10:30 p.m., April 15, at 1:26 p.m., April 16, at 5:30 p.m., and April 22, at 1:58 p.m. However, codefendant Autry did not recall being at the river on those dates and stated that he frequented the "Sunset Bar," which was less than one mile from the river location where he and the Defendant had intended to dispose of the victim's body. When asked about being at the bar at 10:00 a.m., he said that it was a "redneck bar" and that it was open "as long as you got money."

Codefendant Autry agreed that he was six feet, seven inches tall, weighed 250 pounds, and had dark brown hair before it began to gray. Codefendant Autry agreed that he had been a "prolific letter writer" during his confinement and conceded that he had denied falsely in letters and telephone calls any involvement in the offenses before his attorneys were appointed in 2015. He agreed he gave numerous police interviews denying any involvement and knowledge about what happened to the victim. He maintained, though, that he did not kidnap, rape, and kill the victim, although he wanted the victim dead after he realized the victim might have heard his voice and name. He agreed that his acting as a lookout while the Defendant shot the victim assisted in the killing, for which he had remorse.

-18-

Codefendant Autry testified that he was presently serving a 100-month federal sentence in connection with a firearm conviction. He denied knowing that if his testimony in the present case were beneficial to the State, his federal sentence could be reduced upon request. He agreed that he had an immunity agreement with the federal government in connection with the victim's killing, which might have occurred within the boundaries of the Tennessee National Wildlife Refuge. He did not dispute that the federal prosecutor who was involved in negotiating the immunity agreement was initially the State prosecutor in the present case. He did not dispute that he signed a proffer letter, which stated that he agreed to speak with the prosecutors in the present case, that he would cooperate with the State going forward, and that, as a result, his statements would not be used against him. He agreed that the State charges in connection with the victim's killing remained pending, along with a possible death sentence.

Codefendant Autry testified that when he arrived at Mr. Austin's home on April 13, 2011, Mr. Austin's black truck was there but that codefendant Adams's truck was not. Codefendant Autry recalled that the Defendant wore camouflage. He did not recall the Defendant's shoes.

Brian Vitt, a Camden Police Officer, lived in the Yellow Springs community across from property owned by Rayburn and Juanita Hickerson, who was the grandmother of Mr. Austin and codefendant Autry. Mr. Vitt recalled that an old barn sat on the Hickerson property on April 13, 2011, but that the barn had since been destroyed. On April 13, Mr. Vitt arrived home from the midnight shift around 6:00 a.m., his wife left for work around 8:15 a.m., and he began mowing the yard. He did not notice anything unusual that morning. Although he provided a previous statement in which he said he mowed the yard between 7:00 and 9:00 a.m., he was "pretty sure" he waited until his wife left for work. He was uncertain of the time.

Randal McGee installed a satellite system on Mr. Austin's property around lunchtime on April 13, 2011. Mr. Austin was home during the installation, but Mr. McGee did not see anyone else at the home. Mr. Austin stayed inside the home while the satellite was installed. Mr. McGee saw that Mr. Austin drank beer while he was there.

Brenda O'Bryant testified that in April 2011, her parents lived in the Holladay community across the street from Kelly Ridge, which she described as a gated dirt road through the woods. Her parents' property was wooded with three ponds. About one week after the victim's disappearance, she was at her parents' property with her mother and sister, while her father and brother-in-law assisted in the search for the victim in the woods. Ms. O'Bryant said that she saw a silver PT Cruiser moving up the driveway. The man driving the car came to the door and asked for permission to fish in their ponds. Her

mother, who sat at the kitchen table, said that she did not think there were any fish in the ponds. Ms. O'Bryant told the man that he would have to speak with her father, who was not home. Ms. O'Bryant noticed that when she mentioned the victim, the man became "stressed," rolled his eyes, and ran his fingers through his hair. The man said he might return before leaving the property.

Angela Scott Smith, codefendant Autry's former girlfriend, testified that they were in a romantic relationship in 2011 and that he frequently stayed overnight at her home. During their relationship, codefendant Autry parked his PT Cruiser at a convenience store, and she picked him up in the afternoons and drove him to his vehicle in the mornings. On the days she worked, she usually dropped off codefendant Autry around 6:30 a.m., and he brought her lunch around 11:30 a.m. on the days he did not work. She did not recall anything about how she spent her lunch break on April 13, 2011. She knew the Defendant, codefendant Adams, and Mr. Austin as codefendant Autry's friends. She agreed codefendant Autry was a heavy drug user in 2011.

Victor Dinsmore and his wife, Sandra Dinsmore, lived on Yellow Springs Road in the Holladay community at the time of the offenses. He knew the Defendant, codefendants Adams and Autry, and Mr. Austin from selling them drugs. Mr. Dinsmore admitted that he sold the men morphine because his disability payments were insufficient and that he sold "a little bit" of morphine to "survive." Mr. Dinsmore was better acquainted with the Defendant, and at least initially, codefendant Autry went through the Defendant or Mr. Austin to purchase morphine.

On April 13, 2011, Mr. Dinsmore was at Ms. Cooley's home performing remodeling work to her home, which was close to the Defendant's home. Mr. Dinsmore lived about one mile from Mr. Austin's home. Mr. Dinsmore arrived at Ms. Cooley's home at 8:00 a.m. on the day the victim disappeared. As Mr. Dinsmore worked in the garage, the cleaning lady worked inside the home. The Defendant, codefendants Autry and Adams, and Mr. Austin arrived in codefendant Adams's truck. The men left the truck, and the Defendant asked Mr. Dinsmore if he had a marijuana cigarette. Mr. Dinsmore and the Defendant shared the cigarette, and two or three minutes later, the Defendant and Mr. Austin argued and fought. Mr. Dinsmore "heard a few little sprits out of their mouth about who was going to hit it first" and told the men to leave. He explained that the Defendant and Mr. Austin "were talking about who was going to hit it first." Codefendant Autry broke up the fight, and the men left. Mr. Austin sustained a black eye during the incident. Mr. Dinsmore denied that anyone purchased morphine at this time. Mr. Dinsmore denied that while at Ms. Cooley's home, the Defendant said he had parked his truck in Mr. Dinsmore's shop. Mr. Dinsmore said, though, that the Defendant hid the truck in the shop sometime after the victim's disappearance. Mr. Dinsmore recalled that "they moved tires"

in the shop to park the truck inside and that the Defendant hid the truck because he was involved in an incident with "park police," in which the Defendant said he attempted to "run over them in that truck."

Mr. Dinsmore consented to the mass search of his property, and the Defendant's truck was not in the shop at that time. Mr. Dinsmore said that after the victim's disappearance, he did not see the Defendant for two to three weeks, which was unusual. Before the victim's disappearance, Mr. Dinsmore saw the Defendant daily. Two months after the victim's disappearance, Mr. Austin wanted to trade a pistol for drugs. Mr. Dinsmore knew he was not supposed to possess a gun because he was a convicted felon but thought he could sell it. He identified the pistol recovered during the police investigation as the handgun Mr. Austin traded for twelve morphine pills. Mr. Dinsmore recalled that codefendant Autry was present during the trade. Mr. Dinsmore ultimately gave the pistol to his wife for protection but later told her to "get rid of it" because he feared it had been used to kill someone. Ms. Dinsmore disposed of the pistol and, in 2016, Mr. Dinsmore told law enforcement where she disposed of it. The pistol was recovered from a creek-like area three to four miles from Yellow Springs Road.

Mr. Dinsmore received immunity from federal prosecutors in connection with his possession of the pistol. He likewise received immunity from State prosecutors for any gun charges stemming from his possession and disposal of the pistol and for any charges related to the possession, sale, manufacture, delivery, and use of illegal drugs. He agreed that he implicated Michael Alexander in the "burial" of the victim's body. Codefendant Autry called Mr. Dinsmore for morphine before and after the victim's disappearance. The victim's remains were found less than two miles from Mr. Dinsmore's home.

Mr. Dinsmore testified that he blocked out many things that happened around the time of the offenses because "they tried to snatch my daughter, too." Later, he explained that the person who attempted to take his daughter was the Defendant's associate. He said that, as a result, his memory initially had not been clear about when the Defendant hid the white truck in his shop but that his memory was "jogged" by speaking with his wife and daughter. Mr. Dinsmore said that the men did not purchase morphine from him on the day the victim disappeared because he did not have any to sell. He recalled that they wanted a "joint" to "get down off the meth . . . they were doing."

Mr. Dinsmore had a 1985 conviction for rape and denied any involvement in the victim's disappearance. He stated that his conviction was old enough that he was not required to register as a sexual offender and that the matter had been adjudicated. He acknowledged there was a monetary reward in this case but said the reward did not motivate him to cooperate with law enforcement. He said that in 2007, his son, like the

victim, had been murdered, that he knew how the victim's family felt, and that he wanted to help. He did not request immunity for his testimony and was unaware that the statute of limitations had expired for any potential criminal liability. Mr. Dinsmore said that the Defendant "knew his way around the woods like the back of his hand" and "knew every nook, cranny, and corner."

TBI Special Agent Brent Booth testified that during the beginning of the search for the victim, cell phone tower pings from the victim's phone were relayed to law enforcement. The pings indicated, initially, that her phone moved north but then "lingered" in the Yellow Springs community, which was adjacent to the Holladay community. A paper reflecting the victim's name was found in the Yellow Springs community about seventy-five feet from Mr. Austin's driveway. Money and a receipt reflecting the victim's name were found on Ms. Hickerson's property. Nursing-related papers belonging to the victim were found "where the bridge . . . crosses over I-40."

Agent Booth focused on sexual offenders early in the investigation, and he admitted that law enforcement "took Terry Britt's life apart" based upon the victim's cell phone pings in the Yellow Springs community. Mr. Britt, who was a sexual offender, lived four miles south of Yellow Springs Church. Agent Booth conducted physical surveillance of Mr. Britt and placed wiretaps on Mr. Britt's phones and inside Mr. Britt's home. Mr. Britt's home, property, vehicles, and outbuildings were searched pursuant to warrants. Law enforcement also interviewed Mr. Britt's neighbors. Agent Booth acknowledged that after an extensive investigation, law enforcement did not find anything connecting Mr. Britt to the victim. Agent Booth conceded that early in the investigation, law enforcement failed to verify the alibis of the Defendant, codefendants Adams and Autry, and Mr. Austin. Agent Booth said that agents became overwhelmed with the amount of information being reported and that it was "[t]oo much coming in too fast." However, on January 25, 2014, his investigation refocused on the Defendant, codefendants Adams and Autry, and Mr. Austin after his office received a telephone call. He began reviewing the case file and learned that "their stories were false."

In February or March 2014, after the Defendant's arrest, law enforcement searched the Defendant's and the Defendant's grandfather's homes and did not find any evidence connected to the victim's disappearance. Law enforcement likewise searched four vehicles belonging to the Adams family, including a white truck, a black truck, a pewter gray truck, and a red Jeep Wrangler. The vehicles remained in the custody of the TBI at the time of the trial. Agent Booth did not dispute that more than 500 items were obtained from the Defendant's property and later analyzed. The items analyzed included material from a mattress, couches, chairs, ottomans, blankets, hardwood flooring, and carpet. Agent Booth said .32-caliber bullets were not recovered from the Defendant's home. Agent Booth was,

initially, unaware of Ms. Hickerson's barn. However, after speaking with codefendant Autry in early 2017, Agent Booth went to search the barn, but it had been destroyed with only remnants remaining. On the day the victim's partial remains were found, Agent Booth responded to the area behind the cell phone tower, which was about three miles from Mr. Austin's home, about five miles from the Defendant's home, and about one mile from Mr. Dinsmore's home.

Agent Booth spoke to codefendant Autry about a pistol. Codefendant Autry told Agent Booth that Mr. Austin sold the pistol to Mr. Dinsmore, who reported disposing of it. However, with the assistance of the Dinsmores, it was found.

Agent Booth obtained records from 191 Auto Salvage, which did not reflect that the Defendant, codefendants Adams and Autry, or Mr. Austin traded scrap metal for money on the day of the victim's disappearance. The note previously admitted during Ms. Earp's testimony was given to the TBI in February 2014, around the time the Defendant's property was searched.

Agent Booth testified that on January 10, 2013, he obtained a warrant for the victim's family's banking records. He did not dispute that the affidavit reflected the following: He believed that the victim's parents and brother "made false and misleading statements and omissions to law enforcement concerning critical information as to the disappearance of [the victim]." He did not recall the false and misleading statements. Agent Booth stated that the Defendant, codefendants Adams and Autry, and Mr. Austin were excluded as having left a palmprint on the victim's car.

Agent Booth testified that in the summer of 2014, codefendant Adams entered guilty pleas pursuant to an agreement in federal court on gun charges and that as a condition of codefendant Adams's supervised release, he had to live with Dennis Benjamin.

On May 25, 2017, Steve Deaton, lead diver with West Tennessee Dive, Rescue, and Recovery, searched for and recovered a pistol in a creek-like area or "drainage feature" along Joe Holladay Road. It was under fifteen inches of water when it was located. A forensic analysis of the pistol showed that the cylinder was rusted closed and that after it was cleaned, it contained five .32-caliber bullets and was functional.

Debbie Dorris cleaned Dottie Cooley's home on the day of the victim's disappearance. She arrived between 8:00 and 9:00 a.m., and Mr. Dinsmore was at the home that morning, as well. Between 2:30 and 3:30 p.m., she saw three men near a truck talking to Mr. Dinsmore. Ms. Dorris saw that one of the men was codefendant Autry, who

-23-

she described as tall. She could not hear the discussion between the men and saw no other activity.

TBI Assistant Special Agent Michael Frizzell analyzed cell phone records and cell phone tower data from the day of the victim's disappearance. Between 7:30 and 8:00 a.m., no data was recorded on the phones belonging to the Defendant, codefendants Autry and Adams, and Mr. Austin. Agent Frizzell said this could have been the result of the phones being off, the phones being on but not receiving or placing any calls or text messages, or the phones being in a place without cellular service. The records reflect that between 7:30 and 8:11 a.m., the victim's phone communicated with cell phone towers south of her home. The victim's phone made two outgoing communications at 7:33 a.m., and the third and final outgoing communication occurred at 7:42 a.m. The remaining tower communications were the result of incoming communications. At 8:17 and 8:26 a.m., the victim's phone communicated with a tower near Natchez Trace State Park, and at 9:06 a.m., the victim's phone communicated with a cell phone tower located near the Holladay and Yellow Springs communities. Agent Frizzell explained that most of the time, but not always, a phone communicated with the closest tower.

Agent Frizzell reviewed the emergency location-based service data from the victim's cell phone provider obtained moments after the victim's disappearance was reported to law enforcement. The data showed that the possible location of the victim's phone at 8:57 and 9:02 a.m. was somewhere between the cell phone tower near Natchez Trace State Park and the tower near the Holladay and Yellow Springs community. The third location-based service ping occurred at 9:10 a.m. and showed that the victim's phone was possibly somewhere east of the tower near the Holladay and Yellow Springs communities. The final ping was at 9:25 a.m. and showed that the possible location of her phone was within the "distance radius" of her home and the location where her phone and SIM card were later found in Parsons. Records showed that at 9:25 a.m., the Defendant's and codefendant Autry's phones communicated with the tower located near the Tennessee River. Records did not show which tower codefendant Adams's phone used at this same time but showed his phone communicated with the tower located in Parsons at 11:16 a.m.

On the day of the offenses, the Defendant's cell phone records reflected no activity between 4:54 and 8:19 a.m., and as a result, the location of the phone could not be determined. At 8:19 a.m., the Defendant's phone received a text message from codefendant Autry's phone. At 8:30 a.m., the Defendant's phone was used to send a text message to codefendant Autry. The two phones communicated until 8:55 a.m. Codefendant Autry's phone was used to place a call to the Defendant's phone at 8:53 a.m., but the call went to voicemail. Between 8:19 and 8:55 a.m., the two phones communicated with different sectors of the tower located near the Holladay and Yellow Springs

-24-

communities, but Agent Frizzell said that using different sectors of the same tower did not necessarily mean the phones were moving.  The Defendant's home was located south of but close to the tower located near the Holladay and Yellow Springs communities.  Agent Frizzell stated that between 8:19 and 9:12 a.m., the Defendant's phone was in the "same general area" as the victim's phone, based upon the location-based service data from the service provider.  Between 9:10 and 9:12 a.m., the Defendant's phone communicated with the tower located near his home.

However, between 9:50 a.m. and 10:37 a.m., the Defendant's cell phone communicated with the tower located near the Tennessee River.  During this time, the Defendant's phone and Mr. Austin's phone communicated three times, which included telephone calls at 10:10, 10:19, and 10:20 a.m.  The Defendant's phone began to communicate with the tower near his home and close to the Holladay and Yellow Springs communities between 10:36 and 10:49 a.m.  During this time, the Defendant's and Mr. Austin's phones communicated twice, which included telephone calls at 10:39 and 10:43 a.m.  The Defendant's phone communicated with the tower located in Parsons between 11:16 a.m. and 12:18 p.m.

On the day of the offenses, codefendant Autry's cell phone records reflected that his first communication was an outgoing text message to his then-girlfriend at 6:50 a.m. and that his phone communicated with a tower located near her home in the Camden area, north of the Holladay and Yellow Springs Community.  The next communication from codefendant Autry's phone was an outgoing text message to the Defendant's phone at 8:19 a.m., and codefendant Autry's phone communicated with the tower located in the Holladay and Yellow Springs communities.  At 8:55 a.m., codefendant Autry's and the Defendant's phones communicated with the Holladay and Yellow Springs tower, but the victim's phone did not use this tower until 9:06 a.m.  Between 9:42 and 10:40 a.m., codefendant Autry's phone communicated with a tower located near the Tennessee River, which was west of the Holladay and Yellow Springs communities.

Agent Frizzell agreed that at the time of the kidnapping, cell phone records did not reflect the location of the phones belonging to the Defendant, codefendant Adams, codefendant Autry, and Mr. Austin.

In 2011, Candace Wood, the victim's friend, dated Justin Lowery.  Mr. Lowery worked for the City of Parsons and with Mr. Scott, the victim's boyfriend.  On April 9, 2011, the two couples went to the Decatur County Fairgrounds for the "World's Largest Benefit Coon Hunt" for a couple of hours.  As the two men and the victim looked at items being sold by various vendors, Ms. Wood "people watched."  Ms. Wood saw a white man, whom she described as being tall, fat, and with "reddish tint" hair.  The man wore boots

and camouflage, like everyone else there, and appeared to talk on a cell phone. The man held the phone to his left ear, scooted dirt on the ground with a foot, and looked at her and the victim five or six times within fifteen to twenty minutes. Ms. Wood felt uncomfortable. When she looked at the man, he looked down and away from her. She pulled on her boyfriend's sleeve and told him "let's go." At the time, she thought the man looked at her and the victim in a flirtatious manner, but after the victim's disappearance, she reported the information to the victim's mother and to the police. In June 2011, Ms. Wood worked with a sketch artist in order identify the man she had seen. The sketch was received as an exhibit and showed a man with short hair but no facial hair and who wore glasses. Later, the victim's mother showed her a photograph of a man with short reddish hair, with a goatee, and who wore glasses. Ms. Wood confirmed that the man in the photograph was the man she had seen at the fairgrounds, and she learned the man was Mr. Austin.

On April 13, 2011, at 9:45 p.m., John "Dick" Adams, the Defendant's grandfather, placed a 9-1-1 call, in which he requested the police come to his home because his grandson was "causing problems." However, at 9:49 p.m., Mr. Adams stated that he no longer needed the police and ended the call. At 9:51 p.m., Mr. Adams called 9-1-1 again, stating that his "grandson [was] back causing problems . . . trying to get a gun." Police officers responded to the Adams property and documented the incident as a verbal argument. Nobody was arrested as a result of the incident.

Terry Britt testified that at the time of the trial he was serving a sentence in connection with his kidnapping and attempted rape convictions, which were unrelated to the present case, and that after serving his sentence, he would begin serving a sentence for federal-related convictions. He likewise had previous convictions for rape, burglary, robbery, and receiving stolen property. He estimated that in connection with all of his convictions, he had or would serve about twenty-five years in prison.

In 2011, Mr. Britt lived in the Parsons community with his wife, Janet Britt. Although Mr. Britt did not know the victim or her family, he "figured" he would be a person of interest in the victim's disappearance because of his criminal history. On the morning of the offenses, Mr. Britt and his wife left home around 8:00 a.m. and drove to Allgood Salvage in Camden. They looked for a bathtub for a renovation project, but they left and drove to Buck's Building Supply in Decaturville. However, after looking at the bathtubs at this store, they decided to return to Allgood Salvage to purchase a bathtub. Mr. Britt placed the bathtub in the back of their gold truck and drove twenty to thirty miles per hour from Camden to their home in Parsons, which was about a thirty- to forty-five-minute drive. Mr. Britt provided the receipt to law enforcement and recalled that he and his wife were home before lunchtime. Not long after they arrived home, law enforcement stopped at their home and asked where he had been earlier in the morning. Mr. Britt and his wife

had just finished unloading the tub when the officers arrived. He said that his cell phone would have either been inside the truck or inside his home on that morning.

Mr. Britt was unaware at the time that law enforcement had placed wiretaps on his telephones, that "for the first time in the [S]tate of Tennessee[,] they had actually bugged [his] house," and that they "were conducting covert surveillance." Law enforcement searched his home and the outbuildings on his property. Mr. Britt stated in connection with the searches of his property that "they come up with a couple of charges so they could hold me in jail all day" and searched his property after blocking all of the roadways. Other evidence showed that Mr. Britt was arrested for driving on a revoked license and that law enforcement searched his property and home while Mr. Britt was detained. He was released after dark and returned home, which he said was "destroyed." Law enforcement cut pieces from his chair and couch, broke the door to his shop trailer, and took his vans and computers. When asked if cadaver dogs "hit on four tools" during the search, he said, "I don't know what they hit on. I was in jail." Mr. Britt was not charged with a crime in the present case, and he denied having any involvement in the victim's disappearance.

In addition to the gold truck, Mr. Britt owned one black truck, two red vans, and one white van. Mr. Britt acknowledged that when law enforcement arrived at his home on the morning of the offenses, he told the officers he "didn't rape anybody" before the officers stated the reason they were at his home. He said he had heard about a missing woman before the officers arrived.

Mr. Britt delivered newspapers for the News Leader at the time of the offenses. His paper route, which encompassed all of the convenience stores in Decatur County, began in the evening hours. Sometimes he finished his route as late as 3:00 or 4:00 a.m. He acknowledged that he watched pornography and that it was possible he watched videos involving rape, kidnapping, and abduction. He denied that he intentionally searched for videos involving these subject matters. He acknowledged that he said the victim was attractive after reviewing her photograph and agreed that he speculated during a police interview that whoever abducted the victim had taken her to be a "sex slave." Mr. Britt said that he was sarcastic during his interview with then-TBI Agent Terry Dicus because of the way Agent Dicus treated him. Mr. Britt said that Agent Dicus almost destroyed his life. Mr. Britt believed, though, that whoever abducted the victim did it for sexual purposes.

A photograph obtained from the Defendant's Facebook account was received as an exhibit. The photograph depicted a man, and the photograph was titled, "Who am I looking for."

-27-

Anthony Phoenix lived in Parsons around the time of the offenses. Although he lived a productive life at the time of the trial, he had a substance abuse problem, which led to crime, when he lived in Parsons. At the time of the trial, he was on parole for theft and methamphetamine-related convictions. He knew the Defendant and Mr. Austin well, and he somewhat knew codefendants Adams and Autry. Mr. Phoenix and the Defendant "used to . . . [g]et high." He knew the victim's family but did not know the victim well. At the time of the victim's disappearance, Mr. Phoenix was in jail. Upon hearing the victim was missing, Mr. Phoenix said, "[T]he first words that came out of my mouth was I wonder where [the Defendant] was."

After Mr. Phoenix was released from jail in October 2011, he and the Defendant continued to socialize. Mr. Phoenix recalled that anytime the victim's name was mentioned the Defendant's demeanor was "[s]ketchy," which he defined as paranoid, having "something to hide," and nervous. Mr. Phoenix recalled one incident during which several people were at the Defendant's home. Mr. Phoenix mentioned the victim was missing, and the Defendant cleared everyone from the home. During another incident, the Defendant told Mr. Phoenix that he had met with the victim's mother and had expressed concern about whether she believed what he told her. The Defendant stated that he gave her a hug and asked Mr. Phoenix if he thought she believed him. Afterward, at an unspecified time, the Defendant and Mr. Phoenix were driving around looking for something to steal in order to purchase drugs. During the drive, the Defendant "made the comment about – something along the lines of let's rape this b----." Mr. Phoenix looked at the Defendant and asked what that had to do with what they were doing at the moment. The Defendant then stated, "I couldn't have picked a prettier b----." Mr. Phoenix knew that the Defendant was referring to the victim, although the Defendant never mentioned the victim's name. Mr. Phoenix told the Defendant that he did not "want to hear about it," and the Defendant commented "that it sure was fun."

Jamie Darnell lived on Yellow Springs Road in July 2012. He had a twenty-year-old conviction for aggravated burglary and an unspecified misdemeanor conviction. He had known the Defendant since childhood. Mr. Darnell recalled that sometime in July 2012, the Defendant came to his home and was energetic and under the influence of drugs. The Defendant offered Mr. Darnell methamphetamine and wanted to use a syringe to inject Mr. Darnell, who refused. Mr. Darnell wanted to use methamphetamine but did not do "needle dope." The Defendant became agitated as though he were offended by Mr. Darnell's refusal to use the Defendant's syringe. Mr. Darnell said that the Defendant showed him a knife, that he asked how much money the Defendant would take for it, and that the Defendant said if he knew what that knife had done, he would be afraid of holding it. Mr. Darnell asked, "[D]oes it involve what I think it is," and the Defendant "just smiled." Mr. Darnell returned the knife to the Defendant.

-28-

After discussing the knife, Mr. Darnell talked about the victim's disappearance. Afterward, the Defendant pulled out a pistol and fired it above the head of Mr. Darnell's then-girlfriend, who had been sitting on the couch. Mr. Darnell took the pistol from the Defendant and told the Defendant not to do that inside his home. The men walked toward a side door, and the Defendant "broke down," cried, and apologized. Mr. Darnell told the Defendant that the Defendant could not act like that at his home because he had children but that the Defendant could return after the Defendant "cleared his name of everything that was going on and everything that he was being accused of," which he said referred to clearing the Defendant's name in connection with the victim's disappearance. Mr. Darnell said that there were rumors and that the victim's disappearance was a "hot topic." The Defendant responded that he "was too far involved into it, and there was no way he could . . . do that."

Mr. Darnell admitted that he was interested in the reward offered in this case and that he understood it would be divided among the people who helped convict the Defendant. Mr. Darnell knew Mr. Dinsmore, and when asked if Mr. Darnell considered Mr. Dinsmore to be dishonest, Mr. Darnell said, "Certain . . . aspects of his life, yes." Mr. Darnell did not trust Mr. Dinsmore.

In 2011, Carl Stateler was "involved in the drug culture" of Parsons but began living a productive life after he "had enough sense to get . . .out." He had previous misdemeanor convictions. He knew the Defendant, codefendants Adams and Autry, and Mr. Austin. Mr. Stateler did not know the victim or her family. At the time of the offenses, he lived with Mr. Dinsmore and dated Mr. Dinsmore's daughter. During the summer months after the victim's disappearance, Mr. Stateler and the Defendant were together in the Defendant's truck. Mr. Stateler said that the Defendant said, "I let [Mr. Austin] hit it." Mr. Stateler said that the only meaning of the statement was the rape of the victim. Mr. Stateler thought the Defendant meant that the Defendant allowed Mr. Austin to rape the victim. Mr. Stateler did not ask any questions because he did not know.

At the end of summer 2011, Mr. Stateler and the Defendant were at a restaurant in Parsons. While there, Mr. Stateler heard the Defendant speaking to a bartender at the restaurant. The Defendant stated, "I'll kill you like I did [the victim]." The Defendant also stated, "I did it." Mr. Stateler thought the Defendant had confessed to killing the victim or was, at a minimum, involved. Mr. Stateler did not ask the Defendant any questions, but he reported the incident to the TBI in 2011. Mr. Stateler also reported to law enforcement that during the days and weeks immediately following the victim's disappearance, the Defendant "had been high out of his mind for days or weeks . . . . Too high to function." The Defendant's statement that he allowed Mr. Austin to "hit it" was made when the Defendant was too high to function.

Corey Rivers, a registered sexual offender, lived in Florida, but in 2016, he and his friends took a trip "up north." Mr. Rivers did not have a driver's license but drove the vehicle when his friends became too tired to drive. While Mr. Rivers drove, he was stopped by police in Williamson County, Tennessee. Mr. Rivers's friend offered his driver's license, and Mr. Rivers provided this license to the officer during the stop. However, the friend's driver's license had been suspended. Ultimately, Mr. Rivers received sixty days' confinement with two years' probation for using another person's identity. While serving the sixty days in jail, Mr. Rivers met the Defendant. On one occasion, the Defendant saw Mr. Rivers reading the Bible and asked "will God ever forgive him." Mr. Rivers explained to the Defendant that "God will forgive you if you just be honest . . . whatever situation you going through." The men developed a cordial relationship, and the men explained to each other the reasons for their respective incarceration. The Defendant told Mr. Rivers that the Defendant had been charged with kidnapping, rape, and murder. After some time, Mr. Rivers asked the Defendant what happened. The Defendant was vague but stated that he and a couple of friends "got drunk" and took a girl into the woods and that he was "there for the worst of it." The Defendant stated that the girl's body "had been chopped up" and that her upper torso had been found. Mr. Rivers said that although he did not recall the person's name, the Defendant mentioned that one of the people involved in the offenses committed suicide because "of the situation that they had got into," and the person "felt bad." Mr. Rivers reported the statements to law enforcement and did not request anything in return.

Before Mr. Rivers was released from confinement, the Defendant mentioned a video recording he wanted Mr. Rivers to view. Mr. Rivers said the Defendant stated the recording "was right under the nose of . . . the people who's looking into this" and that Mr. Rivers needed to "pay close attention to what [the Defendant] said when he called" Mr. Rivers. The Defendant called once, but Mr. Rivers did not answer the call. Mr. Rivers performed a google search and learned about the allegations against the Defendant. Mr. Rivers and the Defendant never spoke again.

Shawn Cooper was in confinement at the time of the trial for a probation revocation, misdemeanor theft, and driving on a suspended license, and he had previous convictions for aggravated assault and arson. In March 2014, he and the Defendant were at the courthouse for their respective cases. Mr. Cooper was told by court personnel that he was going to be transported to the Obion County detention center, which was also a federal holding facility. When the Defendant learned that Mr. Cooper was going to Obion County, the Defendant asked if Mr. Cooper would be able to speak with any of the federal inmates. Mr. Cooper told the Defendant that he might be able to speak to the federal inmates if he were housed in either of two specified pods. The Defendant told Mr. Cooper to tell the Defendant's brother, codefendant Adams, that "if he don't keep his mouth shut, I'm going

to put him in a hole beside her." Mr. Cooper understood that the Defendant was referring to the victim because the Defendant had said "he was the [victim's] murder case." Although Mr. Cooper did not tell the police about the statement, he later told his "old lady" about it on the telephone. The police came to speak with him nine days later. He received nothing in exchange for his testimony.

Jason Kirk was in confinement at the time of the trial serving a twenty-five-year sentence for an incident related to his escape from jail and a high speed police chase, which ultimately resulted in his turning himself in to the police after hiding for a few days. Mr. Kirk was present when the Defendant spoke to Mr. Cooper outside the courtroom in March 2014. Mr. Kirk was at the courthouse for an arraignment. Mr. Kirk said that the Defendant's message to the Defendant's brother was as follows: "[T]ell him if he doesn't keep his f------ mouth shut, I'm going to plant him next to that b----." The Defendant explained that his brother had been arrested and that in order to "get out of it," his brother was "trying to tell" on the Defendant. Mr. Kirk said that everyone in the jail knew the reason for the Defendant's incarceration.

During Mr. Kirk's arraignment, the trial court imposed a one-million-dollar bond. Afterward, the Defendant entered the courtroom for an arraignment in this case, and the court imposed a two-million-dollar bond. Mr. Kirk said that after the Defendant's arraignment, the Defendant said, "I guess you got to kill a b---- to get that kind of bail around here." The Defendant also stated that he was not worried because "[t]hey don't have no gun. They don't have no conviction, because they don't have a body and they don't have a gun." Mr. Kirk received nothing in exchange for his testimony.

Chris Swift had previous convictions for third degree rape, forgery, attempted spousal rape, and aggravated assault and was, at the time of the trial, on probation. In 2016, Mr. Swift was incarcerated in the Williamson County Jail, and he and the Defendant were housed in the same area. Mr. Swift prayed frequently. On one occasion when Mr. Swift prayed, the Defendant asked if Mr. Swift thought God would forgive the Defendant. Mr. Swift asked, "[F]orgive you for what," and the Defendant responded, "[M]y case . . . the [the victim's] killing." The men prayed together. Over time, the Defendant and Mr. Swift discussed the present case. The Defendant told Mr. Swift that the Defendant was not involved in the killing but that the Defendant was "involved in the worst part of it." The Defendant also told Mr. Swift that "some boy that hung himself" and the Defendant's brother were involved in the killing. The Defendant stated that the Defendant's brother and "some boy that hung himself" were in "the back room having sex with her," that "something went bad wrong," and that the Defendant was "involved in the worst part of it." The Defendant provided no additional details.

-31-

The Defendant told Mr. Swift that the Defendant would be going home after the trial because the police did not have a body, a murder weapon, or a motive. After this discussion, the Defendant met with his attorney. Afterward, the Defendant did not "look good" and reported that "it didn't look good for him." Mr. Swift said that the Defendant looked depressed and said he was probably going to "death row." Mr. Swift was subsequently released from confinement and began his probation. Mr. Swift received a telephone call from the Defendant. During the conversation, the Defendant asked how it felt to be out of jail, and Mr. Swift said he was good. The Defendant said, "I probably wouldn't be talking to anybody else," and ended the call. Mr. Swift felt threatened. Mr. Swift received nothing in exchange for his testimony. However, Mr. Swift told the defense investigators that he did not think the Defendant had anything to do with the victim's killing because he did not believe the Defendant "was capable of it."

**Defense Proof**

Rita Austin, Mr. Austin's mother, and her husband purchased the home where Mr. Austin had lived at the time of the offenses and provided all of the furnishings. She said that Mr. Austin slept with the air conditioner on year-round and that he would not have had any quilts in the home. She said that Mr. Austin did not have a burn barrel at his home and that she and her husband picked up Mr. Austin's trash and disposed of it. A gate at the driveway and a fence were installed on the property in June 2011.

Ms. Austin's mother, Juanita Hickerson, passed away on March 11, 2011. Shirley King, codefendant Autry's mother, and Ms. Austin were sisters. Ms. Hickerson's property was located about one mile from Mr. Austin's home. Mr. Austin sustained extensive facial injuries during an April 2009 motorcycle accident. As an effort to hide scars, Mr. Austin grew a goatee. Mr. Austin did not have an operational vehicle at the time of the offenses because of an accident in March 2011. Afterward, Ms. Austin and her husband took the keys from Mr. Austin, and the truck remained parked outside Mr. Austin's home. The keys were held in a safe at Ms. Austin's home, and she provided them to the FBI. Mr. Austin was "not in a good place" at this time, and he did not have keys to any of Ms. Austin's property.

Ms. Austin testified that on February 23, 2015, Mr. Austin committed suicide. Although Mr. Austin had moved to Florida and worked for his brother-in-law on "cooling towers" in an effort to "get his life straight," he began heavily using drugs again. Mr. Austin was found deceased inside a locked hotel room. Mr. Austin's struggles with substance abuse began at age sixteen and included bouts of sobriety when he had little to no money. However, if Mr. Austin had money, he returned to using drugs.

-32-

Ms. Austin testified that on April 17, 2011, Mr. Austin's property was searched "with a dog team" in an effort to find the victim. She attended the "Coon Hunt" days before the victim's disappearance but did not know whether Mr. Austin attended. On the night of the offenses, she drove Mr. Austin to the "Double D" to play poker around 6:00 p.m., and her husband picked up Mr. Austin later that evening.

In 2011, Ms. Austin's mother owned property with a barn, which was in "bad shape" and was torn down in 2013. She said that after Mr. Austin signed the immunity agreement in 2014, law enforcement "left him alone." She said afterward, Mr. Austin began working in Florida and stayed sober through the end of 2014. Ms. Austin suspected that Mr. Austin began using drugs again in November 2014 and escalated until he took his own life.

Judy Evans, aunt to Mr. Austin and codefendant Autry, testified that the she owned the property that was previously owned by her late mother. She said that on April 13, 2011, she was at the property caring for her horses, which she did daily. The barn on the property was in disrepair in April 2011. She recalled that the tin roof had been missing for years, that rain over time had rotted the wood floor, and that a tree grew "through there." After Ms. Evans learned of the victim's disappearance, she and Ms. Austin searched the property on Friday, April 15, 2011. After they searched the home, they saw an organized search party working its way towards them. Ms. Evans said that members of the party searched all of the buildings on the property, including the barn. She said two people opened both of the barn doors, looked inside, and closed the doors. After the buildings were searched, the party moved toward Yellow Springs Church. Ms. Evans and Ms. Austin fed the horses and opened the barn and looked inside. Ms. Evans did not see anything disturbed or any tire tracks around the barn. She said that if someone had screamed from inside the barn, she would have been able to hear the scream from the road. Ms. Evans's husband tore down the barn in late 2012 or early 2013 and built a new barn.

Former TBI Agent Terry Dicus was the lead investigator in this case until 2013. Law enforcement questioned Mr. Austin at his home after items belonging to the victim were found near his home, and Mr. Austin provided an alibi. Mr. Austin consented to a search using "biological material" dogs. The search revealed holes dug up in the backyard as "hiding places." Later, law enforcement interviewed the Defendant and codefendant Adams. Initially, the Defendant, codefendant Adams, and Mr. Austin claimed to be together at the time of the offenses. Mr. Dicus stated that all motives for the victim's kidnapping were excluded, except for a sexual purpose. He said that the FBI's Behavioral Analysis Unit advised local law enforcement that sexual predators almost always "worked alone" and that one person was responsible for the victim's disappearance.

Law enforcement obtained search warrants for cell phone records from three providers for the day of the victim's disappearance. The records from each provider were "tower dump[s]," which showed all phone activity for "everybody in this area, which was larger than Decatur County." Relative to the Defendant, the records showed that his phone communicated with the tower closest to his home at 8:28 a.m. and that the victim's cell phone communicated with a different tower, which was several miles away, at 8:26 a.m. Upon learning this, Mr. Dicus determined that the Defendant could not have been involved in the kidnapping. Mr. Dicus said that the Defendant, codefendants Adams and Autry, and Mr. Austin continued to come up during the investigation and that as a result, he spoke again to the Defendant, codefendants Adams and Autry, and Mr. Austin. Mr. Dicus spoke to Ms. Earp, as well, and afterward concluded that he was "wasting . . . time . . . [i]nvestigating these idiots."

Mr. Dicus continued his investigation, which led him to John Dodd, who was described as "fairly likeable" but a troublemaker. Mr. Dodd attempted to steal from the victim's home previously and was seen in the relevant area on the day of the victim's disappearance between 8:30 a.m. and noon. Police dogs searched Mr. Dodd's grandfather's property located three or four miles north of the victim's home, and the dogs "alerted." Mr. Dodd lived on this property. However, the handlers reported that the scent was weak, as though someone had walked through the area a couple of weeks before "this happened." The search occurred one or two weeks after the victim's disappearance. Afterward, Mr. Dicus investigated Mr. Dodd's background. Mr. Dodd's white truck was searched. Cell phone and Facebook records were obtained, but Mr. Dodd's alibi was that he was staying with a friend on the day of the victim's disappearance.

Mr. Dicus investigated multiple people. Mr. Dicus's investigation showed that the victim disappeared at 7:45 a.m., that her cell phone was moving at 8:00 a.m., and that her phone was disassembled between 9:25 a.m. and 9:40 a.m. He said that the relevant time frame was between 7:45 and 9:40 a.m. and that he investigated every person identified as a possible suspect and excluded every person based upon phone records and alibis. He excluded James Barnes as a possible suspect because Mr. Barnes notified people at 7:47 a.m. on the morning of the victim's disappearance. Mr. Dicus said that although his opinion was not held by everyone, it was "idiotic to think [Mr. Barnes] was involved in it." Mr. Dicus, likewise, investigated Mr. Britt, who "perfectly matched" the physical description of the man walking into the woods with the victim. Mr. Dicus said that although the victim's brother agreed that Mr. Austin matched the description of the man, Mr. Austin had red-brown hair, whereas the victim's brother said the man had black hair. After reports of Mr. Britt's "stalking" various women, who had similar appearances as the victim, Mr. Dicus learned Mr. Britt was a violent sexual offender. Mr. Britt's alibi that he and his wife were together all day was investigated, his cell phone records were obtained,

and his property was searched. Mr. Dicus concluded that Mr. Britt's alibi "was garbage." After learning through wiretaps of a cell phone number believed to belong to Mr. Britt, records were obtained that showed no incoming or outgoing telephone calls from the phone until 12:17 p.m. when Mr. Britt's former wife called on the day of the offenses. At an unspecified time, Mr. Britt's phone communicated with his wife's cell phone for almost three minutes, which led Mr. Dicus to conclude that the alibi was "fabricated." Although the Britts had a receipt from Allgoods Salvage, Mr. Dicus could not verify the Britts were at the store because the store did not have a surveillance system. Likewise, the store did not have a carbon copy of a receipt that matched the receipt provided by Ms. Britt. However, the Britts had another receipt for vinyl remnants at Allgoods Discount from the day of the victim's disappearance, but Mr. Britt denied going there that day. Mr. Dicus also obtained a credit card receipt from a gas station at 2:30 p.m. in Benton County, and Mr. Britt's phone records placed the phone in the same area.

Mr. Dicus learned that Mr. Britt changed his appearance. Mr. Dicus obtained Mr. Britt's prison photographs throughout the years, and all of the photographs showed Mr. Britt with shoulder-length dark hair. Mr. Dicus learned from three witnesses that around the time of the victim's disappearance, Mr. Britt cut his hair. However, Mr. Dicus did not know if the haircut occurred before or after the offenses. Mr. Dicus did not dispute that Mr. Britt's son said Mr. Britt cut off his ponytail after being released from prison, which was two years before the victim's disappearance. Mr. Britt's home was located "at the geographic center" of where evidence was obtained and was about five to eight miles northeast of the victim's home. Mr. Britt was familiar with the area where the victim's remains were found. Mr. Dicus learned that Mr. Britt drove around and drank all day and that "they" went to that wooded area because the police did not patrol there.

Mr. Dicus learned that Mr. Britt purchased cell phones and 1000 minutes in March 2011 and that "[t]wo different lots" of 1000 minutes were purchased on April 11, 2011. On April 29, 2011, Mr. Britt purchased a chainsaw and other items related to the chainsaw. The purchases were made at Walmart, and the respective receipts were received as exhibits.

During a search of Mr. Britt's home and surrounding property involving the use of "decomposition dogs," the dogs indicated by their actions to the presence of the scent of human decomposition on a couple of hammers, a shovel, and an axe that had been inside a storage shed. Photographs of the items were received as an exhibit. The dogs also indicated the scent of human decomposition on two of Mr. Britt's vehicles. Inside Mr. Britt's van, hairs were found that were microscopically and macroscopically identical to the victim's hair, but DNA analysis later showed that the hairs did not belong to the victim.

-35-

Mr. Dicus's investigation showed no evidence that the victim's brother and the Defendant were "meth buddies." The investigation showed, though, that there "was a connection" between N.B., the victim's cousin, and the Defendant, who admitted that at an unspecified time they had a "relationship." However, cell phone records did not reflect communications between them around the time of the offenses. Mr. Dicus learned during his investigation that N.B. had worked at a gentleman's club, which was located less than one mile from the Defendant's home, and that N.B. had previously lived with Ms. Earp, the Defendant's former girlfriend. Mr. Dicus was not aware if N.B. had been "trading sex for drugs with [the Defendant]."

Mr. Dicus recalled that at the time of the victim's disappearance, the Defendant weighed 135 pounds and was approximately six feet, two inches tall with "shorter" hair. Mr. Dicus recalled that the Defendant looked "really skinny" and like "the Joker." Mr. Dicus said that codefendant Autry was about six feet, six inches tall and described his height as "impressive." Mr. Dicus said that Mr. Austin had been five feet, ten inches tall and weighed between 180 and 225 pounds. Mr. Dicus said that although Mr. Austin's weight "could have been within the frame of what we're looking at," Mr. Austin had short red hair. Mr. Dicus said that codefendant Adams was about six feet, one inch tall, was "slender," and weighed about 165 pounds with short dark hair.

Arthur Viveros, the FBI lead case agent in the victim's disappearance, investigated Mr. Britt. Agent Viveros listened to the real-time conversations through the telephone wiretaps and listening devices from inside Mr. Britt's home. Although most telephone calls and conversations from inside the home were recorded, Agent Viveros listened in real time to one conversation that was not recorded due to a technical issue. During the telephone call, Mr. Britt and his sister spoke about whether the police were listening to Mr. Britt's conversations. Mr. Britt's sister advised him not to speak on the telephone because the police might have been "tapping the lines." Mr. Britt responded, "Yeah, I know. . . . these whores, law enforcement, are going to try to pin . . . [the victim's] case on me, and so we're going to have to watch it." Agent Viveros recalled that Mr. Britt and his sister continued talking as though they did not care about being recorded. After the call ended, Agent Viveros heard, through the listening device inside the home, Mr. Britt tell his wife that he did not know the victim and that he could not recall what he and Ms. Britt did on the day of the victim's disappearance. Agent Viveros said that Ms. Britt told Mr. Britt that they left home around 10:30 a.m., that they drove to Camden, and that they bought a bathtub. Mr. Britt interjected and said that he remembered the man at the store sold them the $300 bathtub for $150; that afterward, they drove to Decaturville and returned home by 1:00 p.m.; and that the police came by the home to speak with him about the victim. Agent Viveros said that Mr. and Ms. Britt never discussed whether there might have been

a listening device inside their home, and Agent Viveros did not think they had any idea it was inside the home.

Agent Viveros interviewed codefendant Adams in December 2011. As Agent Viveros sat inside his law enforcement vehicle "wrapping up the interview," the Defendant arrived and saw Agent Viveros. The Defendant left his vehicle and yelled at Agent Viveros to "get the f--- out of . . . here." Agent Viveros identified himself and left his business card, after telling the Defendant that he had spoken with codefendant Adams.

On the day of the victim's disappearance, Decatur County Sheriff's Deputy Travis Dunavant drove to Mr. Britt's home to conduct an interview, but nobody was home. Deputy Dunavant did not recall when he was at the Britt home but said he was at another person's home at 1:40 p.m. Deputy Dunavant recalled that the only vehicle at the home was a red, broken-down van.

John "Dick" Adams, the Defendant's grandfather, testified that neither he nor the Defendant owned a .32-caliber revolver in April 2011. Mr. Adams recalled that the Defendant's shoe size was thirteen, and he identified a pair of size thirteen Croc shoes he picked up from the Williamson County Jail for the Defendant.

Mr. Adams testified that codefendant Adams was placed in "special education" classes due to "a learning problem" and a below average I.Q. Codefendant Adams lived with Mr. Adams because he "wouldn't hold a job." Mr. Adams recalled that his wife, Becky Adams, died on March 31, 2011, that the funeral was on April 2, and that the Defendant was arrested on April 4 in Natchez Trace State Park. The Defendant drove a 1998 white Nissan truck at the time of the arrest. Mr. Adams paid to have Don's Body Shop tow the truck from Natchez Trace Road to Don's Body Shop on April 4, 2011, and the truck stayed at Don's Body Shop for no more than three days. Mr. Adams recalled that if he picked up the truck within three days, he would not incur a late charge from Don's Body Shop. The invoice from Don's Body Shop was received as an exhibit and reflects a towing charge of $100. The invoice does not reflect a late charge. After Mr. Adams took possession of the truck, he had it stored in a shed at the property of Betty Bell, a family friend. Ms. Bell drove Mr. Adams to pick up the truck, and she allowed him to store the truck in a shed on her property. Mr. Adams declined to take the truck home because he did not want the Defendant driving it and noted the Defendant's driver's license had been suspended. Mr. Adams possessed the only set of truck keys at all times to prevent the Defendant from getting the keys, and Mr. Adams was certain the Defendant did not at any time have the truck keys. Mr. Adams recalled that the truck stayed with the Bell family for "nearly" two weeks and that the Defendant never asked about the truck's location. Mr. Adams did not think the Defendant knew where the truck was stored.

-37-

Mr. Adams owned a van, which he drove, and the Defendant owned two non-operational trucks around the time of the victim's disappearance. One truck was wrecked weeks before the victim's disappearance, and the second truck had a damaged radiator. Codefendant Adams drove a truck, and Mr. Adams said codefendant Adams was not "in the habit" of allowing the Defendant to drive the truck.

On the morning of the victim's disappearance, Mr. Adams left home at 7:00 or 7:30 a.m. to go to work. When Mr. Adams left, codefendant Adams was in bed, but he saw the Defendant, codefendant Adams, and Mr. Austin later that morning at an unspecified time. Mr. Adams said they were on Highway 641, coming "across the interstate headed south." Mr. Adams maintained a "daily log," which he described as a daily diary of what he did each day at work. He said that reviewing his log entry on the day of the victim's disappearance "jogged his memory" with regard to where he was when he saw the Defendant, codefendant Adams, and Mr. Austin.

Mr. Adams spoke to law enforcement multiple times during the investigation, but he did not recall telling the police in 2011, "I don't know anyone specifically that you should look [at], but I would look at all of [the Defendant's] friends." Three years later, Mr. Adams told the police that around 10:00 a.m. on the morning of the victim's disappearance, he saw the Defendant, codefendant Adams, and Mr. Austin in codefendant Adams's green truck "in front of the Shell station at the 126 exit and were traveling south." Mr. Adams agreed that he told law enforcement that he thought the Defendant was "a good candidate" for having been involved in the victim's disappearance.

At the time of the victim's disappearance, Billy Bell and Mr. Adams worked together at North Utility Water District. Mr. Bell testified that on April 13, 2011, the white truck owned by Mr. Adams but used by the Defendant was at Mr. Bell's mother's property. Mr. Bell recalled first seeing the truck at his mother's property on April 6, after Mr. Bell returned from his honeymoon. Mr. Bell was at the property nightly at 10:00 p.m. feeding his hunting dogs, and he thought the truck was on the property for two to three weeks. Mr. Bell thought he would have noticed if the truck had not been on the property. Mr. Bell said, though, the Defendant or anyone else could have gotten the truck without his mother's knowledge.

On April 13, 2011, Mr. Bell did not see the Defendant driving a white truck on the day the victim disappeared. Mr. Bell also did not recall driving past exit 126 or seeing the Defendant, codefendant Adams, and Mr. Austin at the Shell convenience store but said it was possible the men were at the store.

TBI Crime Laboratory Analyst Linda Littlejohn examined a shoe print found inside the garage at the victim's home. A "gel lift" was used to collect the shoe print from the garage floor and was compared to a pair of shoes belonging to the victim's brother. The shoe print in the garage and the victim's brother's shoes were consistent in size, shape, and tread design. She concluded that the victim's brother's right shoe could have made the print in the garage. However, she determined that there "were no individual characteristics" and that, as a result, she could not determine that the victim's brother's shoe made the print to the exclusion of all other shoes. Ms. Littlejohn only received shoes from the victim's brother, and she did not analyze shoes belonging to Mr. Austin.

Amber Treat, a private investigator, replicated the drives for three routes involved in the investigation. First, she drove from Yellow Springs Church to the Tennessee River at the Interstate 40 bridge, which took twenty-six minutes. Second, she drove from the bridge to Yellow Springs Church using a different route, which took thirty-two minutes. Last, she drove the route of the victim's cell phone tower pings on the day of the disappearance, which took forty-three minutes.

John Walker, Senior Inspector with the United States Marshals Service, assisted the TBI in the investigation. He tracked and mapped the location of the victim's cell phone. After reviewing the phone data from the service provider, he developed a map of the location of the victim's phone and provided the TBI with advice on where to search for the victim.

In March 2013, United States Marshal Walker interviewed Mr. Britt, who was incarcerated at the time. He explained to Mr. Britt that he wanted to discuss a possible "deal about locating [the victim's] remains." Mr. Britt denied knowing the victim but sat down at the interview table when Marshal Walker mentioned that Mr. Britt knew N.B. Mr. Britt did not appear to "mind being in jail," but he expressed his frustration about his inability to speak with his wife on the telephone, the loud conditions at the jail, and his concern his wife might be charged criminally for an unspecified reason. Marshal Walker told Mr. Britt what law enforcement believed happened to the victim. He said that the police believed Mr. Britt had "an issue with women," that Mr. Britt saw the victim with N.B. about three weeks before the victim's disappearance, and that Mr. Britt began following the victim to learn her routine. He suggested to Mr. Britt that he went to the victim's home to kidnap the victim, that he positioned himself outside to be able to grab her when she left, that she struggled with him, that he struck her, that they knelt down in an effort for the victim to recover from being struck, and that they walked into the woods. Marshal Walker told Mr. Britt that he matched the description provided by the victim's brother, and Mr. Britt stated, "[T]hat boy don't know what he saw." Marshal Walker told Mr. Britt that he got in his car around 8:00 a.m., traveled north using the least traveled

roads with the fewest homes, arrived near the interstate around 8:30 a.m., stayed near the interstate for twenty-five minutes, left the area, and disposed of some of the victim's belongings as he drove home but disposing of the larger items in a nearby creek. Mr. Britt stated, "[S]ounds like you have it all figured out, I'll plead to it and you can close the case." Marshal Walker told Mr. Britt that he needed to know the location of the victim's body, and Mr. Britt responded, "I can't give you something I don't have."

In April 2011, Kristie Gutgsell worked as a bail bondsman at Professional Bonding. On April 4, 2011, she bonded out the Defendant after his arrest at Natchez Trace State Park for drug-related charges and evading arrest. After the Defendant's release, Ms. Gutgsell saw scratches "all over him like he had ran through the woods basically, and he also had like old scars on his arms." She also saw scratches "all over" his arms, legs, and neck.

Jonathan Reeves, President of JDR Telecom Solutions and an expert in cellular phone technology, analyzed cell phone records obtained by law enforcement related to the Defendant, the victim, codefendants Adams and Autry, and Mr. Austin. None of the phones analyzed contained GPS technology because it was not available at the time, and none of the data analyzed by Mr. Reeves contained location-based data. On the morning of the victim's disappearance, her phone communicated with the tower near Natchez Trace State Park at 8:17 a.m., which Mr. Reeves stated was the first tower communication "that was not on one of the [towers] that would otherwise serve her home area." Before 8:17 a.m., all of the cell tower communications were with towers located between Darden, where the victim lived, and Parsons. The 8:17 a.m. tower communication indicated to Mr. Reeves that the victim's phone moved away from her home. Mr. Reeves stated that two minutes later, at 8:19 a.m., the Defendant's phone communicated with the tower located near the Yellow Springs and Holladay communities where the Defendant lived. Mr. Reeves said that the tower sectors were not overlapping and would "not typically . . . toggle" between those two towers. At 8:25 a.m., the victim's cell phone communicated again with the tower near Natchez Trace State Park, and the Defendant's phone communicated again with the tower near his home at 8:29 a.m. Mr. Reeves concluded, based upon the data, that the two phones were in separate locations. He also concluded that based upon the maps of the area, two- and four-minute time gaps were not enough time to transition from one tower sector to another.

However, at 8:53 a.m., the Defendant's cell phone communicated with the southwest sector of the tower located near his home, whereas it had only previously communicated with the southeast sector. Mr. Reeves noted that the Adams family property was located in such a position that a phone could utilize the southeast and southwest sectors of the tower while being on the property. At 8:58 and 8:59 a.m. the Defendant's phone communicated with the southeast sector of the tower located near his home. At 8:57 a.m.,

the victim's phone communicated with the northeast sector of the Natchez Trace State Park tower, whereas it had previously communicated with the northwest sector. Mr. Reeves said that although the phones were "getting closer," they were not necessarily in the same location. At 9:01 and 9:06 a.m., the victim's phone communicated with the southwest sector of the tower near the Defendant's home. At 9:10 a.m., the victim's and the Defendant's phones were communicating with the same sector of the tower located near the Defendant's home. At 9:25 a.m., the victim's phone communicated with the tower in Parsons, which was south of the Defendant's home. Tower communications reflect that the Defendant's phone continued to communicate with the tower near his home through 9:12 a.m. From 9:50 a.m. to 10:37 a.m., the Defendant's phone communicated with the tower near the Tennessee River but communicated again with the tower located near his home at 10:38 a.m. Mr. Reeves concluded that the victim's phone moved north from her home, traveled east, and then moved south, which was east of the victim's home. Mr. Reeves also concluded that the Defendant's phone communicated with the tower near his home until his phone moved toward the Tennessee River.

Relative to codefendant Autry, his cell phone placed a call to the Defendant's cell phone at 8:19 a.m. and communicated with the northern sector of the tower located near the Holladay and Yellow Springs communities. At the same time, the victim's cell phone communicated with the southern sector of the Natchez Trace State Park tower, and Mr. Reeves concluded that the victim's and codefendant Autry's phones were in different locations. Codefendant Autry's phone continued to communicate in the same general area until 8:52 a.m., at which time the phone communicated with the southeast sector of the tower near the Holladay and Yellow Springs communities. At 9:42 a.m., codefendant Autry's phone communicated with the tower near the Tennessee River. Mr. Reeves concluded that codefendant Autry's phone records "don't place him in any" of the victim's phone locations at the same times.

Relative to Mr. Austin, his cell phone communicated with the southwestern sector of the tower near the Holladay and Yellow Springs community when the phone was located on Mr. Austin's property. Mr. Reeves stated that the records did not reflect that codefendant Autry's phone communicated with this tower. Mr. Austin's phone's first tower communication was at 9:23 a.m. with the southwestern sector of the tower near the Holladay and Yellow Springs communities. Mr. Austin's phone continued to communicate with the same sector through 10:55 a.m., and it communicated with the southeastern sector of the same tower at 11:01 a.m. Mr. Reeves concluded that based upon the 9:25 a.m. tower communication of the victim's phone and the 9:23 a.m. tower communication of Mr. Austin's phone, that the phones were communicating with different sectors but that there could have been "overlap."

-41-

At 9:42 a.m., codefendant Autry's cell phone communicated with the northeast sector of the tower near the Tennessee River. At 9:50 a.m., the Defendant's phone communicated with the same tower sector and continued to communicate with it until 10:32 a.m., at which time the Defendant's and codefendant Autry's phones communicated with the northwestern and southeastern sectors of the same tower. The Defendant's phone communicated with the same tower through 10:37 a.m. Although there was a time gap until codefendant Autry's next tower communication, the Defendant's phone returned to using the southeastern sector of the tower located in the Holladay and Yellow Springs communities at 10:38 a.m. Mr. Reeves concluded that the Defendant's and codefendant Autry's phones were together as they moved from the tower at the Tennessee River to the tower near the Holladay and Yellow Springs communities within six minutes, from 10:32 to 10:38 a.m. Mr. Reeves testified that if the Defendant's cell phone had any activity during the time the communications transitioned from one tower to the next, he would have expected to see communications with the southern sector of the tower at the Tennessee River. However, no communications from there were recorded.

Between 10:49 and 10:55 a.m., the Defendant's and Mr. Austin's cell phones both communicated with the southwest sector of the tower located near the Holladay and Yellow Springs communities. Between 11:15 a.m. and 12:10 p.m., their phones communicated with the southern sector of the tower located near Parsons, and at 12:18 p.m. their phones communicated with the northeastern sector of the tower located near Parsons, which led Mr. Reeves to conclude that "they start to travel back to the north" and return to communicating with the southwestern sector of the tower near the Holladay and Yellow Springs communities. Mr. Reeves concluded that the phones traveled in the same general direction and were active on the same "sites" and that the phones were likely together during this time.

Relative to the northeast sector of the cell phone tower at the Tennessee River, Mr. Reeves analyzed data for April 2011 for the Defendant, codefendants Adams and Autry, and Mr. Austin. Mr. Reeves concluded that all four men's phones repeatedly communicated with the tower "to varying degrees" throughout April 2011. There were tower communications before and after the victim's disappearance.

Mr. Reeves concluded that overall the cell phone records reflect that the victim's and the Defendant's phones were not "at the same location at the same time during that morning." He stated that although on one occasion the Defendant's phone was located near the tower close to his home and the victim's phone transitioned into the same sector at 9:10 a.m. before moving south toward the tower near Parsons, there were occasions on which their phones were not together. Mr. Reeves, likewise, concluded that there "was no correlation" between codefendant Autry's and the victim's phones.

-42-

Mr. Reeves, however, could not determine the location of Mr. Austin's and codefendant Adams's cell phones at the time of the victim's disappearance at 7:45 a.m. because the phones did not have any activity until later that morning. Mr. Reeves agreed that their phones could have been turned off if they stood outside her home abducting the victim at 7:45 a.m. Mr. Reeves agreed, too, that a phone could be on a nightstand while someone slept. Mr. Reeves could not determine the location of the Defendant's phone before 8:19 a.m. Mr. Reeves said that the Defendant's phone communicated with the southwestern sector of the tower located near the Defendant's home in the Holladay and Yellow Springs communities and that the phone communicated again with the same sector and tower at 8:53 a.m. The Defendant's phone then communicated with the southeastern sector of the same tower multiple times between 8:59 and 9:12 a.m. Mr. Reeves agreed that it was possible the Defendant was at home during these times but said it was "very, very unlikely" the Defendant's phone was at Mr. Austin's home.

TBI Special Agent James Garnett analyzed Mr. Britt's home computer pursuant to a search warrant and located the entire Internet history. Mr. Britt frequented pornography websites and entered various search terms, including "abducted," "rape scene," "rape anal," "anal rape," "kidnapped," and "kidnapped and rape." The searches were performed on January 6, 8, and 12, 2011.

**State's Rebuttal Proof**

The victim's father testified that two or three days after the victim's disappearance, he and a cousin went to various locations, including the property surrounding Mr. Austin's home, searching for the victim. While on the property, the victim's father did not speak to anyone but saw a burn barrel and a black truck. The burn barrel was located on the right side of the home "toward the front."

Retired TBI Special Agent Jack Vanhooser began supervising the investigation in September 2012, and he determined that Mr. Dicus needed to be placed on administrative duties, rather than following leads, because Mr. Dicus "lost his objectivity" and "had tunnel vision on a particular suspect and was not objective about all of the facts coming into the case." Mr. Vanhooser selected TBI Special Agent Joe Walker to lead the investigation.

Upon this evidence, the jury convicted the Defendant of first degree premeditated murder, first degree felony murder committed during the commission of a kidnapping, first degree felony murder committed during the commission of a rape, two counts of especially aggravated kidnapping, and three counts of aggravated rape. The trial court merged the first degree felony murder convictions with the first degree premeditated murder conviction. The court likewise merged the two especially aggravated kidnapping convictions and the

three aggravated rape convictions. Before the sentencing phase of the bifurcated proceeding began, the parties announced a sentencing agreement, which was accepted by the trial court. The agreed-upon sentence required consecutive service of life imprisonment without the possibility of parole for first degree murder, twenty-five years for aggravated rape, and twenty-five years for especially aggravated kidnapping, for an effective sentence of life imprisonment without the possibility of parole plus fifty years. This appeal followed.

## I.    Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. He does not allege that the State failed to establish the elements of the conviction offenses. Rather, he argues that the evidence failed to corroborate the accomplice testimony of codefendant Autry in connection with the homicide and rape convictions and that the evidence failed to establish his identity as the perpetrator of the kidnapping. The Defendant likewise asserts that his convictions violate his due process rights. The State responds that sufficient evidence corroborated codefendant Autry's testimony and established the Defendant as one of the perpetrators. The State does not address the Defendant's constitutional claim.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to

establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The identity of the perpetrator is a question of fact for the jury to determine. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

"An accomplice is defined as a person who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). "[A] conviction may not be based solely upon the uncorroborated testimony of an accomplice." *See, e.g.*, *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886 (Tenn. 2013). In order for accomplice testimony to be adequately corroborated:

> there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bigbee*, 885 S.W.2d at 803 (quoting *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992) (citations omitted)); *see Shaw*, 37 S.W.3d at 903.

Regarding the question of whether a person is an accomplice, the term "accomplice" does not include a person who has guilty knowledge, or is morally delinquent, or who was even an admitted participant in a related but distinct offense. To constitute one an accomplice, the person must perform some act or take some part in the commission of the crime or owe some duty to the victim in danger that makes incumbent on the person to prevent its commission. An accomplice is "'one culpably implicated in, or who unlawfully co-operates, aids, abets, or assists in, the commission of the crime charged. The generally accepted test as to whether a witness is an accomplice is whether the person could have been convicted for the offense, either as principal or accessory.'" *Pennington v. State*, 478 S.W.2d 892, 898 (Tenn. Crim. App. 1971) (quoting 2 *Wharton's Criminal Evidence* § 448

(12th ed. 1955)). A person is not deemed an accomplice simply because the person was present at the crime scene. *Letner v. State*, 512 S.W.2d 643, 647 (Tenn. Crim. App. 1974); *Hicks v. State*, 149 S.W. 1055, 1056 (Tenn. 1912).

In the light most favorable to the State, the record reflects that on April 13, 2011, the victim disappeared from her home around 7:45 a.m., and her cell phone was "disassembled" between 9:25 and 9:40 a.m. Around 7:45 a.m., James Barnes heard "arguing" and the victim "screaming a little" before it stopped. Although Mr. Barnes did not initially consider the episode serious, he called his mother, which cell phone records reflect occurred at 7:47 a.m., and asked her to call the victim's mother. The victim's brother awoke around 7:40 a.m., looked out the widows overlooking the garage, and heard a man's and the victim's voices. The victim's brother saw the silhouette of two people knelt below the window. After speaking twice to his mother, who advised him to call the neighbors and to shoot the man because the man was not the victim's boyfriend, the victim's brother saw the victim and the man walking toward the woods, which contained a sixty-yard trail leading to a drivable logging road. The man held an object that could have been a pistol. The victim's blood was found on the garage floor where the victim and the man had knelt. The victim's brother's description of the man matched the physical description of Mr. Austin, except for the man's hair color and length. When the victim's brother described the man to the Defendant after the victim disappeared, the Defendant stated that the description matched Mr. Austin.

Fifteen minutes before the kidnapping, at 7:30 a.m., John Babb, who owned property near the victim, saw a white truck moving extremely fast and revving its engine about 150 to 200 yards from the victim's home. A white truck was, likewise, seen in the same area approximately two weeks before the victim's disappearance. Ms. Clenney saw a white truck "idling on" the road less than one mile from the victim's home between 7:30 and 8:00 a.m. The driver of the truck asked Ms. Clenney if he had scared her and said he thought she was a girl who lived in the area. Although Ms. Clenney was uncertain about the driver's identity, she reviewed photographs shown to her by law enforcement, and she focused on a single photograph of a man she thought looked like the driver. The photograph on which Ms. Clenney had focused depicted the Defendant.

Ms. Earp, the Defendant's then-girlfriend, was awakened by the Defendant between 6:30 and 7:30 a.m. on the morning of the victim's disappearance. The Defendant told her he was going to "haul off scrap" metal, but TBI Special Agent Booth obtained the records from 191 Auto Salvage, which did not reflect that the Defendant, codefendants Adams and Autry, or Mr. Austin traded scrap metal for money on the day of the victim's disappearance. Documents from Birdsong Auto Salvage, likewise, did not show that the Defendant exchanged scrap metal for money. Ms. Earp testified that around lunchtime on the day of

the victim's disappearance, the Defendant drove his white truck to her workplace in Parsons and that a trailer necessary for hauling scrap was not attached to the truck. Cell phone records showed that the Defendant's phone communicated with the tower in Parsons at 11:16 a.m. and 12:18 p.m.

Codefendant Autry testified that he contacted the Defendant about purchasing morphine. Cell phone records confirmed that a text message sent from codefendant Autry's phone was received by the Defendant's cell phone at 8:19 a.m. and that codefendant Autry's phone communicated with the cell phone tower near the Holladay and Yellow Springs communities where the Defendant and Mr. Austin lived. Phone records reflect that at 8:30 a.m., the Defendant's phone was used to send a text message to codefendant Autry, that the two phones communicated until 8:55 a.m., and that each phone communicated with the tower near the Holladay and Yellow Springs communities. Codefendant Autry testified that he received a call from the Defendant around 8:40 or 8:50 a.m. and that the Defendant reported that he was busy and would call back when "he got to a location." Phone records confirmed that between 8:19 and 8:55 a.m., both men's phones communicated with the cell phone tower near the Holladay and Yellow Springs communities. The defense expert testified that the victim's phone communicated with this tower at 9:01, 9:06, and 9:10 a.m. When the Defendant called codefendant Autry, the Defendant requested codefendant Autry's assistance. Codefendant Autry drove to Mr. Austin's home in the Yellow Springs community as the Defendant instructed and arrived around 9:00 a.m., at which time codefendant Autry purchased morphine from Mr. Austin and used it inside codefendant Autry's PT Cruiser. Mr. Austin's home was near the property with the dilapidated barn and had been owned by his late grandmother. While at Mr. Austin's home, codefendant Autry saw a large blaze coming from a burn barrel, in which Mr. Austin burned "stuff." During a search of the property surrounding Mr. Austin's home two or three days after the victim disappeared, the victim's father saw a burn barrel "toward the front" of the right side of Mr. Austin's home. Aside from the burn barrel, codefendant Autry saw codefendant Adams standing shirtless and saw the Defendant standing next to the Defendant's white truck. Codefendant Autry saw that Mr. Austin had a pistol holstered to his side, and Mr. Austin told everyone to leave because a technician was coming to the property to install a satellite system. Randall McGee testified that he installed a satellite system around lunchtime at Mr. Austin's property on the day of the victim's disappearance and that nobody else was on the property.

Although codefendant Autry thought the Defendant needed assistance with making methamphetamine on the day of the victim's disappearance, the Defendant asked him to help bury the victim, who was wrapped in a blanket, lay against the back of the Defendant's white truck, and appeared deceased. Cell phone records reflect that between 8:19 and 9:12

-47-

a.m., the Defendant's and the victim's phones were in the "same general area" and communicated with the tower located near the Defendant's and Mr. Austin's homes.

The Defendant and codefendant Autry, with the victim in the back, drove the Defendant's white truck to the Tennessee River under the Interstate 40 bridge. Between 9:40 a.m. and 10:00 a.m., the Defendant backed up his truck and stopped at a pile of large limestone rocks close to the bridge. The men removed the victim from the back of the truck and lay the victim on the rocks. Codefendant Autry saw a small area of blood on the blanket in which the victim was wrapped. When the Defendant walked to the truck, codefendant Autry saw the victim's foot move and heard a sound of distress coming from the victim. When codefendant Autry informed the Defendant of what he had seen and heard, the Defendant had a "dead look" and was silent as he retrieved a pistol, which had previously been holstered to Mr. Austin, from the truck. Codefendant Autry acted as a lookout to ensure nobody was in the area when the Defendant shot the victim once. The examination of the victim's partial remains showed that the victim sustained a single gunshot wound to the back of the head and that although the distance was indeterminant, skull fractures were consistent with a close "range of fire." The wound to the skull was likewise consistent with a .32-caliber pistol, and the pistol recovered in this case was a .32-caliber pistol containing five bullets. After the Defendant shot the victim, the men heard a boat motor and abandoned their plan to dispose of the victim's body at the Tennessee River. Codefendant Autry stated that he and the Defendant were at the river for less than one hour. Cell phone records reflect that the Defendant's and codefendant Autry's phones communicated with the tower located near the Tennessee River at 9:25 a.m. The records also showed that the Defendant's cell phone communicated with the tower located near the Tennessee River between 9:50 a.m. and 10:37 a.m. and returned to communicating with the tower near the Defendant's and Mr. Austin's homes in the Holladay and Yellow Springs communities between 10:36 and 10:49 a.m. Codefendant Autry's phone communicated with the tower near the Tennessee River between 9:42 and 10:40 a.m. The defense expert concluded that the Defendant's and codefendant Autry's phones were together as they moved from the tower at the Tennessee River to the tower near the Defendant's home. Then, the men parted ways for a few hours.

Cell phone records reflect that the victim's cell phone communicated with the towers near her home between 7:30 and 8:11 a.m. The victim's final outgoing communication was at 7:42 a.m. However, at 8:17 and 8:26 a.m., the victim's phone communicated with the tower near Natchez Trace State Park but began communicating with the tower near the Defendant's and Mr. Austin's homes in the Holladay and Yellow Springs communities between 9:01 and 9:06 a.m. The Defendant's and codefendant Autry's phones communicated with the same tower at 8:55 a.m., and codefendant Autry arrived at Mr. Austin's home around 9:00 a.m.

-48-

Around 2:15 p.m., codefendant Autry contacted the Defendant to purchase more morphine and afterward, drove to the Defendant's home at 2:30 p.m. The Defendant's white truck was not at the Defendant's home, although he had driven it hours earlier when he and codefendant Autry went to the Tennessee River intending to dispose of the victim's body. Ms. Earp, the Defendant's then-girlfriend, testified that "close to the afternoon," which would have been after the Defendant and codefendant Autry parted after going to the Tennessee River but before codefendant Autry arrived at the Defendant's home around 2:30 p.m., the Defendant drove his white truck to her workplace. When codefendant Autry arrived at the Defendant's home, he noticed that the Defendant, codefendant Adams, and Mr. Austin had been fighting, were angry, and stood near codefendant Adams's black truck. Not long after the victim's disappearance, the Defendant was seen by members of Trooper Rainey's search team vacuuming the black truck. The Defendant's white truck was not at the Adams property. All of the men entered codefendant Adams's truck and drove to Ms. Cooley's home to meet with Mr. Dinsmore, who had morphine for sale. During the drive, the Defendant and Mr. Austin argued, and Mr. Austin told the Defendant, "[Y]ou didn't have to kill her." The Defendant responded to Mr. Austin, "[Y]ou're just as d--- guilty, you hit it," "[Y]ou shut your f------ mouth. I am sick of it being discussed," and "I'll whoop your . . . a--." Codefendant Autry explained that "hit it" referred to sexual intercourse. When the men arrived at Ms. Cooley's home, everyone left the truck except codefendant Adams. Outside the truck, the Defendant and Mr. Austin fought. Codefendant Autry recalled that Mr. Dinsmore and a woman, whom he could not identify, came out of Ms. Cooley's home and that the fight ended. Mr. Dinsmore likewise testified that the Defendant and Mr. Austin fought and that they "were talking about who was going to hit it first." Ms. Dorris, who was also at Ms. Cooley's home, testified that between 2:30 and 3:30 p.m., she saw three men standing outside a truck talking to Mr. Dinsmore and that one of the men was codefendant Autry.

Codefendant Autry testified that while speaking to Mr. Dinsmore, the Defendant stated that he had moved tires around inside Mr. Dinsmore's shop in order to conceal the Defendant's white truck. Although Mr. Dinsmore was unclear about when the Defendant hid his truck inside the shop, Mr. Dinsmore testified that the truck was hidden inside the shop sometime after the victim's disappearance.

Two days after the victim's disappearance, the Defendant and codefendant Autry spoke inside codefendant Autry's PT Cruiser. During the discussion, codefendant Autry asked the Defendant what he had done with the victim's body. The Defendant responded, "[W]e threw her out near Kelly Ridge," which codefendant Autry described as a large wooded area. Approximately one week later, codefendant Autry drove past Kelly Ridge and saw buzzards sitting near a pond bank and thought the victim's body might have been there. In an effort to gain access to the property, codefendant Autry drove to the property

-49-

owner's home and requested permission to fish, but he was not granted access to the pond. Brenda O'Bryant testified that about one week after the victim's disappearance, a man, who drove a PT Cruiser, came to her parents' home requesting permission to fish on the property, which was located across the road from Kelly Ridge. Ms. O'Bryant told the man that he would need to speak with her father, who was participating in a search for the victim. Ms. O'Bryant noticed that when she mentioned the victim, the man became "stressed," rolled his eyes, and ran his fingers though his hair before leaving the property.

About one week after the victim's disappearance, FBI Special Agent Ross interviewed the Defendant and observed visible scratches on the Defendant's arms and legs. Photographs showed vertical linear markings on the "front inside part" of the Defendant's left arm. Although the Defendant explained that he sustained the scratches when running through the woods to avoid apprehension during an arrest on April 4, 2011, Mr. Hill testified that the Defendant did not have any linear markings on his left arm at the time the Defendant was apprehended inside Natchez Trace State Park. However, Ms. Earp testified that she saw three parallel scratches on the Defendant's neck on the evening of the victim's disappearance, which he had not had when he left home that morning.

Months after the victim's disappearance, the Defendant and codefendant Autry spoke of the victim. During the discussion, the Defendant admitted he, codefendant Adams, and Mr. Austin raped the victim and described the incident as "a brief encounter." The Defendant likewise stated that Mr. Vitt had been mowing the yard at the time. Mr. Vitt, who lived across the road from Ms. Hickerson's barn in the Yellow Springs community, testified that on the morning of the victim's disappearance, he began mowing his yard between 7:00 and 9:00 a.m. Mr. Vitt believed he began mowing after his wife left for work around 8:15 a.m. Cell phone records reflected that between 8:19 and 9:12 a.m. the Defendant's and the victim's phones were in the "same general area" and that the Defendant's phone communicated with the tower located near the Holladay and Yellow Springs communities. Other evidence showed that the Defendant's home, Mr. Austin's home, and Ms. Hickerson's barn were in close proximity and that items belonging to the victim were found seventy-five feet from Mr. Austin's driveway and on Ms. Hickerson's property. The area where the victim's partial remains were found was three miles from Mr. Austin's home and five miles from the Defendant's home. Further, codefendant Autry spoke to codefendant Adams months after the victim's disappearance and, as a result of the discussion, codefendant Autry searched Ms. Hickerson's barn on Yellow Springs Road in order to "clean up any possible evidence left behind" but found none.

Approximately four to five months after the offenses, codefendant Autry accompanied Mr. Austin to meet with Mr. Dinsmore in order to trade the pistol that had been used to kill the victim. Mr. Dinsmore testified that about two months after the

offenses, he, Mr. Austin, and codefendant Autry met because Mr. Austin wanted to trade the pistol for morphine. Mr. Dinsmore identified the pistol recovered during the investigation as the pistol Mr. Austin traded for twelve morphine pills. After taking possession of the pistol, Mr. Dinsmore gave it to his wife, but he ultimately told her to "get rid of it" because he feared it had been used to kill someone. Mr. Dinsmore's wife disposed of the pistol in a creek-like area three to four miles from Yellow Springs Road.

Additionally, the Defendant's inculpatory statements in the aftermath of the offenses were significant. Mere days after the victim's disappearance, Ms. Earp saw Mr. Austin smirk and laugh about a news report related to the victim, and she heard the Defendant say that law enforcement would "never be able to find her." Further, when Ms. Earp ended her relationship with the Defendant in July 2011, the Defendant threated to "tie [her] up just like he did [the victim]" and said "nobody would never see [Ms. Earp] again." Afterward, she and the Defendant continued to socialize, although their romantic relationship had ended. During this time, she overheard a conversation between the Defendant and Mr. Mitchell, the Defendant's friend. The Defendant told Mr. Mitchell that "everything was ready to go in the back of the truck to put up under the Birdsong Bridge" at the Tennessee River. The Defendant said, "Take the Tupperware – it was a blue Tupperware thing to Birdsong." She said, "They said it was the remains of [the victim]."

Mr. Phoenix, the Defendant's friend, testified that the Defendant's demeanor changed any time the victim was mentioned. The Defendant became paranoid and acted as though he had something to hide. During one incident, the Defendant cleared everyone from his home at the mere mention of the victim's disappearance. The Defendant also told Mr. Phoenix about his conversation with the victim's mother and expressed concern about whether she believed what he told her. In a separate exchange while the Defendant and Ms. Phoenix were looking for something to steal, the Defendant commented, "[L]et's rape this b----," "I couldn't have picked a prettier b-----," and "[I]t sure was fun." Mr. Phoenix knew the Defendant referred to the victim.

In July 2012, the Defendant showed Mr. Darnell, the Defendant's friend, a knife, and Mr. Darnell inquired about whether the Defendant would sell it. The Defendant, stated that if Mr. Darnell knew what the knife had done, he would be afraid of holding it. When Mr. Darnell asked, "Does it involve what I think it is," the Defendant smiled. Mr. Darnell heard rumors that the Defendant was involved in the victim's disappearance, and he told the Defendant not to return to his home until the Defendant had "cleared his name." The Defendant responded that he "was too far involved into it, and there was no way he could . . . do that." In the summer 2011, the Defendant likewise told Mr. Stateler, "I let [Mr. Austin] hit it," which Mr. Stateler interpreted this as a reference to the victim. Mr. Stateler

-51-

also heard the Defendant threaten a bartender at a restaurant by stating, "I'll kill you like I did [the victim]."

After the Defendant's arrest, he made additional inculpatory statements regarding the kidnapping, rape, and murder of the victim. The Defendant asked two fellow inmates, Mr. Rivers and Mr. Swift, if God would forgive him. The Defendant told Mr. Rivers that he and a couple of friends, one of whom killed himself because "of the situation that they had got into," took a girl into the woods and that the Defendant was "there for the worst of it." The Defendant also told Mr. Rivers that the girl's body "had been chopped up" and that the torso had been found. Likewise, the Defendant wanted to know from Mr. Swift if God would forgive him for "my case . . . [the victim's] killing." The Defendant told Mr. Swift that he was present for "part of it," that the Defendant's brother and another man who "hung himself" were in the "back room having sex with her," and that "something went bad wrong." Mr. Austin's mother testified that Mr. Austin committed suicide in 2015. After Mr. Swift was released from confinement, he received what he thought was a threatening telephone call from the Defendant who instructed him not to talk to anybody else.

In March 2014, while at the courthouse to determine the Defendant's bond, the Defendant asked Mr. Cooper, a fellow inmate, to give his brother, codefendant Adams, a message once Mr. Cooper arrived at the Obion County Jail where codefendant Adams was being confined. The Defendant wanted his brother to know that if his brother "don't keep his mouth shut," the Defendant would "put him in a hole beside her." Mr. Kirk, another inmate, was present when the Defendant and Mr. Cooper spoke and recalled the Defendant's message to codefendant Adams was to "keep his f------ mouth shut" or the Defendant would "plant him next to that b----." The Defendant explained to the men that the Defendant's brother was going to "tell" on the Defendant to "get out of it." Further, after the trial court set the Defendant's bond, the Defendant stated to fellow inmates, "I guess you got to kill a b---- to get that kind of bail around here." The Defendant's bond was set at two million dollars. The Defendant also stated that he was not worried, though, because the police "don't have a gun. They don't have no conviction, because they don't have a body and they don't have a gun." The victim's partial remains were not found until September 2014, and, therefore, the fact that the victim had been shot was unknown to everyone but the perpetrators.

The parties do not dispute that codefendant Autry was an accomplice and that his testimony required independent corroboration. We note that the trial court instructed the jury that codefendant Autry was an accomplice and that "before the defendant can be convicted, [the jurors] must find that this accomplice's testimony has been sufficiently corroborated." Upon review, we conclude that codefendant Autry's testimony was

-52-

sufficiently corroborated and that the evidence is sufficient to support the Defendant's convictions. We likewise conclude that a reasonable jury could have determined beyond a reasonable doubt that the Defendant participated in the kidnapping, rape, and murder of the victim. The Defendant is not entitled to relief on this basis.

Although the Defendant alleges that generally, his convictions violate his due process rights, he did not raise his constitutional allegations in the motion for a new trial. He, likewise, does not cite to supporting legal authority in his brief. As a result, appellate consideration of the issue is waived for the failure to raise them in the trial court proceedings. *See* T.R.A.P 3(e) ("[N]o issue presented for review shall be predicated upon error . . . occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); *Id*. (36)(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *Id.* 27(a)(7)(a) (requiring that an appellant's argument contain "citations to the authorities and appropriate references to the record . . . relied on."); *see also* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived[.]"); *State v. Howard*, 504 S.W.3d 260, 277 (Tenn. 2016) ("[A] defendant may not advocate a different or novel position on appeal."). The Defendant is not entitled to relief on this basis.

## II. Motion to Recuse

The Defendant contends that the trial court erred by denying the Defendant's motion for the court to recuse itself after an alleged ex parte communication with the prosecutor and pretrial statements by the court which the Defendant alleges indicated the court's belief that the Defendant was guilty of the charged offenses. The State responds that the court did not err in denying the motion to recuse.

We need not linger on this issue, which was raised in an interlocutory appeal as of right pursuant to Tennessee Supreme Court Rule 10B, section 2. *See State v. Zachary Rye Adams*, No. W2017-00359-CCA-R10B-CO (Tenn. Crim. App. Feb. 28, 2017) (order) (affirming the trial court's denial of the motion to recuse). This court considered the issue on its merits and denied relief. *See id.* The Defendant has raised the issue again in this appeal, relying on the same facts and arguments raised in the interlocutory appeal. We are bound by our previous determination as the law of the case. *See Judy Morrow Wright v. Matthew G. Buyer*, No. W2019-01157-COA-R3-CV, 2021 WL 796701, at *1, 4-6 (Tenn. Ct. App. Mar. 2, 2021) (holding that the court was bound by the law of the case regarding a judicial recusal issue raised in a previous Rule 10B appeal), *perm. app. denied* (Tenn.

June 15, 2021); *see also Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998) (holding "under the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal"). The issue was previously determined adversely to the Defendant, and he is not entitled to relief on this basis.

## III. Disqualification of Defense Counsel

The Defendant contends that the trial court erred by granting the State's motion to disqualify attorney Luke Evans as a member of the defense team, which he argues deprived him of a due process right to counsel of his choosing. The State responds that the court did not abuse its discretion.

The State filed a notice of intent to seek the death penalty against the Defendant, who was provided with appointed trial counsel and co-counsel as required in a death penalty case. *See* Tenn. Sup. Ct. R. 13, § 3(b)(1). The record reflects that the Defendant was represented by three attorneys at the trial. Lead counsel was appointed in June 2015, and co-counsel was appointed in August 2015. Before the trial, the defense team contacted Mr. Evans to determine if he would be willing to join the defense team. Mr. Evans had represented Shayne Austin in the case involving the victim's disappearance and death. Mr. Austin was not charged as a codefendant and was deceased by the time the defense team inquired about Mr. Evans's willingness to represent the Defendant. Before undertaking the representation, Mr. Evans consulted with the Board of Professional Responsibility (BPR) and received an informal opinion that no conflict of interests existed. The defense filed an ex parte, sealed request for appointment of Mr. Evans as third counsel, which the court approved, and Mr. Evans filed a notice of appearance on January 10, 2017. The prosecutors and defense counsel communicated about the prosecutors' concern that Mr. Evans had a conflict of interests due to his prior representation of Mr. Austin. On January 24, the trial court and the parties participated in a telephone conference about the disagreement, and the trial court ruled that Mr. Evans was disqualified from representing the Defendant. On February 1, the court conducted a hearing on the Defendant's motion for the trial court to recuse itself, which was based upon factual allegations related to the circumstances of the telephone conference, and for the court to reconsider its disqualification of Mr. Evans.

In the previous appeal, we summarized the following relevant facts related to the January 24, 2017 telephone conference and the Defendant's motion to reconsider the disqualification:

-54-

The defense team received an email from the State notifying them that the prosecutor arranged a teleconference with the trial judge on January 24, 2017.

The [Defendant] averred in his motion [for recusal and for reconsideration of the disqualification] that during the teleconference, the trial judge stated that the prosecutor contacted him about a potential conflict with Mr. Evans's representation of the [Defendant]. The [Defendant] maintained that based on the trial judge's comments, "it is apparent that [the prosecutor] and the Court discussed the substance of the matter in detail, including the fact that the defense team had received an ethics opinion from the BPR." The [Defendant] stated that during the telephone conversation between the trial judge and the prosecutor, the prosecutor expressed concern about engaging in settlement negotiations with the defense team while Mr. Evans was representing the [Defendant]. According to the [Defendant], the trial judge instructed the prosecutor to contact defense counsel in an effort to resolve the matter.

During the teleconference, the trial judge found that Mr. Evans was disqualified from further representation of the [Defendant] and determined that Mr. Evans's representation of the [Defendant] would erode the public's confidence in the judicial process. Defense counsel requested that she be heard on the record and indicated her intention to appeal the issue. The trial judge granted the [Defendant] an opportunity to present the issue during an upcoming status conference.

*Zachary Rye Adams*, No. W2017-00359-CCA-R10B-CO, at *3 (order).

After the Defendant filed his motion for recusal and for reconsideration of the disqualification,

[T]he State filed a written response in opposition to the [Defendant]'s motion for recusal of the trial judge. The State set out the history of Mr. Evans's representation of Mr. Austin, including (1) his negotiation of an immunity agreement with the State in exchange for Mr. Austin's cooperation in the investigation; (2) his attendance at a meeting with law enforcement officers during which Mr. Austin disclosed that the [Defendant] confessed to killing [the victim] and disposing of her body in the Tennessee River; (3) his assisting in obtaining a handwritten note from Mr. Austin regarding the [Defendant]'s involvement in [the victim's] death; (4) his communications

-55-

with the State during which the State indicated that they were rescinding the immunity agreement because they believed that Mr. Austin was not being completely truthful; and (5) his affirmation of the truthfulness of Mr. Austin's statements.

*Id.* at 3.

During a hearing on February 1, 2017, defense counsel presented the testimony of Erin Honeycutt, defense counsel's assistant who was present and took notes during the teleconference on January 24. Ms. Honeycutt testified that during the teleconference, the trial judge stated that, originally, he had agreed to appoint Mr. Evans as a third attorney for the [Defendant] but had stated that the Tennessee Administrative Office of the Courts ("AOC") would determine whether Mr. Evans could be compensated through the indigent defense fund. The trial judge stated that defense counsel indicated that Mr. Evans had assured them that no conflict of interest existed and that he had confirmed this information through the BPR. The trial judge noted that the AOC had not approved Mr. Evans's fee claim and that the claim had been submitted to the Tennessee Supreme Court. Ms. Honeycutt stated that defense counsel informed the trial judge that the [Defendant] had signed a waiver of any potential conflict.

Ms. Honeycutt testified that the trial judge informed the parties that he received a telephone call from the prosecutor, who said "she was worried about a conflict. I know they say the board says it's okay. She didn't raise—BPR might result in censure . . . or some type of warning, but we're in a new dimension when we're dealing with the death penalty." Ms. Honeycutt stated that the trial judge also said that the prosecutor expressed concern about engaging in settlement negotiations "with the appearance of conflict." The trial judge stated that he told the prosecutor to discuss the matter with defense counsel to determine whether the issue could be resolved. During the teleconference, the prosecutor confirmed that she attempted to resolve the issue with defense counsel but was unable to do so. Ms. Honeycutt stated that when the prosecutor asked whether the trial judge would like to hear the State's concerns about Mr. Evans's representation of the Defendant, the trial judge ruled that Mr. Evans was disqualified from representing the Defendant because "the appearance of conflict is so strong" and that Mr. Evans's representation of the Defendant "might reflect poorly in the confidence of judicial procedure."

Ms. Honeycutt testified that defense counsel requested permission to present the issue in open court and discussed the possibility of seeking an interlocutory appeal. The trial judge agreed to allow defense counsel to present the issue during a hearing and stated that Mr. Evans was invited to attend the hearing. The trial judge stated that if no settlement

were reached before the hearing, the parties should be ready to proceed with a trial on April 3.

Mr. Evans testified at the hearing on the motion for recusal and to reconsider the disqualification order that he had represented Mr. Austin, who had not been charged but had been identified as a person of interest in the investigation of the victim's disappearance and homicide. Mr. Evans and Mr. Austin met with TBI agents, and Mr. Evans negotiated an immunity agreement for Mr. Austin with an assistant district attorney assigned to the case. Mr. Evans later filed a civil action on behalf of Mr. Austin seeking enforcement of the immunity agreement after the prosecutors indicated their intent not to honor it; however, Mr. Austin died by suicide before the matter was resolved.

Mr. Evans testified that when he contacted the BPR about whether a conflict of interests existed in his accepting representation of the Defendant, he disclosed the following facts: His client was deceased, and he had received information from the Defendant's defense team "that essentially there would be a consistent defense theory at play in trial," which he explained meant that "not only was [the Defendant] innocent of this, they were all innocent of this . . . including Shayne Austin." Mr. Evans said he received an informal opinion stating that no conflict of interests existed in his accepting an appointment to represent the Defendant and that, if he represented the Defendant, he could not disclose any confidential information he learned in his prior representation of Mr. Austin. Mr. Evans said he discussed his prior representation of Mr. Austin with the Defendant, who signed a waiver of any conflict of interests. Mr. Evans said he filed a notice of appearance once he received word that the trial court had appointed him. The record reflects that the notice of appearance was filed on January 10, 2017, and that Mr. Evans participated in a discovery conference with the State and other members of the defense team shortly thereafter. On January 16, Mr. Evans received an email message from an assistant district attorney expressing concern that Mr. Evans had a conflict of interests in representing the Defendant after having previously represented Mr. Austin.

At the February 1, 2017 hearing on the motion to reconsider, the trial judge recalled his rationale for his previous ruling, "I said that upon further reflection, I had reached a conclusion that he could no longer ethically be part of the representation. That just based upon facts that I knew essentially from his prior representation, concerning the fact that for all [intents and] purposes, he was representing a fourth codefendant."

In denying the motion to reconsider, the trial judge stated:

Concerning the Court's [previous] ruling, in retrospect, which they say hindsight is 20/20, the appointment of Mr. Evans should never have taken

place in an ex parte motion. Those are for services and things like that to provide indigent defendant adequate representation. Such as -- and I'm not referring to anything in this case, I'm just saying in general, mitigation specialists, investigators, there's any number of things.

It should have occurred to me that I've never seen an attorney put on board through an ex parte motion. The first time I realized that that was the improper vehicle was when I got the telephone conversation [with the assistant district attorney requesting to schedule a telephone conference of the parties] of less than two minutes. She said I have concerns, and it occurred to me at that time, they had not been able to express concerns that the Court might have been very interested in. That's why this should have been taken up in open court where they argue that, yes, Rule 13 requires two death penalty-certified attorneys and does not provide for a third attorney. Mea culpa, I shouldn't have done it that way. But once I realized that -- what the conflict truly was in this case, I didn't let either side go into any discussion during that telephone conference.

And the words that I used were not appearance of impropriety. By Ms. Erin, by her notes that were read earlier, it was appearance of conflict. I am absolutely satisfied that there is a conflict in this case, and that there is a distinct likelihood of additional conflicts developing throughout this case, and particularly in the sentencing phase where the rules are different. There might be hearsay. I think Mr. Evans would be placed in an absolute conflict of interest having received information from his now deceased client that might be in conflict with what Mr. Adams might or might not place evidence concerning.

I honestly think that probably there's no one in this courtroom, with the possible exception of [defense counsel], that does not see the conflict in this case. It's overwhelming. If we were to use the medical scale of 1 to 10 where they ask you pain, I would say conflict is at 10 on this case. That's how strong it is, and that's how strong the Court feels.

It's not proper for Mr. Evans to serve on this particular case. The Court confirms its earlier disqualification.

After the trial court disqualified Mr. Evans as the third attorney in February 2017, another attorney, Jerry Gonzalez, filed a notice of appearance on June 22, 2017. After preliminary jury selection in April and July, 2017, the trial began on September 9, 2017.

A party moving to disqualify an attorney in a criminal case must establish a conflict of interests by a preponderance of the evidence. *State v. White*, 114 S.W.3d 469, 476 (Tenn. 2003). A trial court's decision to disqualify an attorney for a conflict of interests and to impute an attorney's conflict of interests upon the attorney's firm is reviewed for an abuse of discretion. *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001); *see State v. Culbreath*, 30 S.W.3d 309, 312-13 (Tenn. 2000). A court abuses its discretion by "apply[ing] an incorrect legal standard, or reach[ing] a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999); *see Clinard*, 46 S.W.3d at 182.

The Defendant argues that the trial court erred in disqualifying Mr. Evans based upon an appearance of impropriety. The Defendant claims that Tennessee Supreme Court Rule 8, Rule of Professional Conduct 1.7, provides for disqualification only upon a showing of an actual conflict of interests, and that the trial court erred in disqualifying Mr. Evans based upon a finding of an appearance of impropriety and in the absence of an actual conflict of interests.

We begin our analysis by noting that although the trial court may have initially expressed in the January 24, 2017 telephone conference that an appearance of impropriety existed, the court ultimately determined at the February 1 hearing that an actual conflict of interests existed. Because this was the final basis upon which the court relied, we will limit our review to whether its determination regarding an actual conflict was an abuse of discretion.[4]

The Rules of Professional Conduct provide the following relative to a conflict of interests:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

---

[4] Our limiting review to this basis should not be construed as a passive acceptance of the defense's argument that the trial court was limited to consideration of disqualification based solely upon the existence of an actual conflict of interests. In that regard, this court and our supreme court have continued to apply the appearance of impropriety standard discussed in *Clinard*, 46 S.W.3d at 187, notwithstanding the adoption of the Rules of Professional Conduct, which became effective on January 1, 2011. *See, e.g.*, *State v. Sonya Nale*, No. E2021-00276-CCA-R9-CD, 2022 WL 844587, at *3 (Tenn. Crim. App. Mar. 22, 2022); *State v. Derek T. Grooms*, No. W2019-01324-CCA-R10-CD, 2020 WL 9171956, at *8-9 (Tenn. Crim. App. Nov. 25, 2020).; *cf. State v. White*, 114 S.W.3d 469, 476 (Tenn. 2003) (recognizing the authority of a court to remove an attorney based upon a conflict of interests or "a serious potential for conflict").

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

(c) A lawyer shall not represent more than one client in the same criminal case or juvenile delinquency proceeding, unless:

(1) the lawyer demonstrates to the tribunal that good cause exists to believe that no conflict of interest prohibited under this Rule presently exists or is likely to exist; and

(2) each affected client gives informed consent.

Tenn. Sup. Ct. R. 8, § 1.7.

In addition, the Rules provide the following provisions regarding an attorney's duties to a former client:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related

-60-

matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

(b) Unless the former client gives informed consent, confirmed in writing, a lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

(1) whose interests are materially adverse to that person; and

(2) about whom the lawyer had acquired information protected by RPCs 1.6 and 1.9(c) that is material to the matter.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter reveal information relating to the representation or use such information to the disadvantage of the former client unless (1) the former client gives informed consent, confirmed in writing, or (2) these Rules would permit or require the lawyer to do so with respect to a client, or (3) the information has become generally known.

Tenn. Sup. Ct. R. 8, R.P.C. 1.9.

In the present case, the Defendant signed a waiver of the conflict of interests. Notwithstanding the existence of a waiver, our supreme court has recognized the inherent authority of a court to disqualify an attorney based upon a conflict of interests or "a serious potential for conflict." *See White*, 114 S.W.3d at 476; *see also Wheat v. United States*, 486 U.S. 153, 160 (1988). Mr. Austin was deceased and, therefore, no waiver could be obtained from him. The Supreme Court has said that the attorney-client privilege survives the death of the client. *Swidler and Berlin v. United States*, 524 U.S. 399, 406 (1998). Mr. Austin enjoyed a confidential attorney-client relationship with Mr. Evans, his attorney in the investigation of the victim's disappearance and death. Mr. Evans was involved in obtaining Mr. Austin's immunity agreement involving cooperation with the investigation and in Mr. Austin's proffer about the facts of the case to the TBI, which tended to inculpate the Defendant. When the State indicated its intent not to honor the immunity agreement, Mr. Evans represented Mr. Austin in a civil action to enforce the agreement, and that action was pending at the time of Mr. Austin's death.

Mr. Austin's death did not terminate the attorney-client privilege established during Mr. Evans's representation of him in his lifetime. Due to Mr. Austin's death, informed consent for Mr. Evans to represent the Defendant in the same matter could not be obtained. Despite the Defendant's claim in the trial court that no conflict existed because all charged defendants intended to pursue a common theory that none were involved in the crimes, Mr. Austin had agreed pursuant to the immunity agreement to cooperate in the investigation and had provided information which tended to inculpate the Defendant. Further, the facts presented at the trial show that both Mr. Austin and the Defendant were involved in the crimes. We note the trial court's concern, as well, that Mr. Evans would be placed in a situation involving conflicting interests of his obligations to Mr. Austin and the Defendant if the jury found the Defendant guilty and the trial proceeded to the capital sentencing phase.

Mr. Evans's representation of the Defendant after having represented Mr. Austin in the same matter posed a concurrent conflict of interests because the representation of both was directly adverse and because of the significant risk that his representation of the Defendant would be materially limited by his duties to his former client, Mr. Austin. *See* Tenn. Sup. Ct. R. 8, § 1.7(a)(1), (2). The conflict could not be waived by the Defendant alone; the rules require the informed consent of both affected parties. *See id*. at Rule 8, §§ 1.7(b)(4), (c)(2), 1.9(a), (c). Upon review, we conclude that the trial court did not abuse its discretion in disqualifying Mr. Evans from representing the Defendant.

In reaching this conclusion, we have considered the Defendant's argument that the trial court's ruling deprived him of a due process right to counsel of his choosing. It is well-established that an indigent defendant's right to counsel "does not include the right to appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel." *State v. Carruthers*, 35 S.W.3d 516, 546 (Tenn. 2000); *see State v. Parsons*, 437 S.W.3d 457, 478 (Tenn. Crim. App. 2011); *see also State v. Huskey*, 82 S.W.3d 297, 304 (Tenn. Crim. App. 2002) (stating that a defendant who is financially able to retain counsel should be afforded the opportunity to retain the counsel of his choosing but that an indigent defendant enjoys no absolute right to the counsel of his choosing). In any event, Mr. Evans served as the third appointed counsel for less than one month before the court disqualified him, and the Defendant was ultimately represented by three attorneys at his trial. The Defendant has not shown that the disqualification of Mr. Evans was an abuse of discretion or that it violated a constitutional right. He is not entitled to relief on this basis.

## IV. Tennessee Rule of Evidence 404(b)

The Defendant contends that the trial court erred by admitting evidence of the Defendant's other bad acts pursuant to Tennessee Rule of Evidence 404(b).

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b) prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait. Tenn. R. Evid. 404(b). Such evidence, though, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id*.; *see State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Before a trial court determines the admissibility of such evidence,

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). The standard of review is for an abuse of discretion, provided a trial court substantially complied with the procedural requirements. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *see State v. Electroplating, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998).

## A.    Codefendant Autry

The Defendant argues that the trial court erred by allowing codefendant Autry to testify that the Defendant asked codefendant Autry to kill codefendant Adams. The State responds that the court did not err by admitting the testimony.

At a jury-out hearing, Codefendant Autry testified that when he arrived in the woods behind the convenience store after the victim's disappearance, the Defendant left codefendant Adams's truck and got inside codefendant Autry's PT Cruiser. Codefendant Autry stated that he handed the Defendant a "meth pipe," that the Defendant smoked methamphetamine, and that he asked the Defendant what he "did" with the victim's body. Codefendant Autry said that the Defendant stated that he "throwed her out over near Kelly Ridge" and that he wanted to discuss something with codefendant Autry. Codefendant Autry said that the Defendant stated, "f------ [codefendant Adams] ain't been to bed and won't stop talking about it. . . . I want to see if you'll get rid of him, kill him for me." Codefendant Autry stated that the Defendant "made an offer" for him to kill codefendant Adams.

The State argued that the evidence was relevant to the Defendant's motive, intent, and his plan to get away with the offenses against the victim. The State asserted that the Defendant feared that codefendant Adams was going to implicate the Defendant in the offenses. The Defendant argued that the statements were made two days after the offenses occurred and were not directly related to the victim. The Defendant argued that the statements were irrelevant to whether the Defendant was involved in the kidnapping, rape, and murder of the victim. The Defendant, likewise, argued that the evidence was highly prejudicial and outweighed any probative value because it "paints [the Defendant] out to be a killer of his own brother . . . that's . . . a second attempted murder that they're trying to pull in here."

The trial court determined that the evidence was "contextual" and if true, showed "an attempt to cover [up] a crime by further doing things" to prevent the victim's killing from being discovered. The defense argued that the Defendant was not charged with

covering up the victim's murder. The court, however, determined that the evidence was "part of the context" and was "particularly probative in this case." The court determined that the evidence was clear and convincing and was not about a particular character trait but that the evidence showed an attempt to prevent the victim's murder from being discovered. The court, likewise, found that the probative value outweighed the danger of unfair prejudice. The court found, alternatively, that even if the evidence did not fall within the scope of 404(b), it was admissible contextual evidence. A recess was taken, and when court resumed, the court clarified that that although it did not state specifically that the evidence was material, the court "implied that [the] particular evidence was material." The court likewise stated that the evidence was relevant to the "entire story" and that it would provide a limiting instruction.

> After codefendant Autry's testimony, the trial court instructed the jury as follows:

> Ladies and gentlemen of the jury, you have heard testimony that the defendant, Zachary Adams, allegedly attempted to engage this witness to harm Dylan Adams, as well as other potential bad acts. You may not consider such testimony to prove his disposition to commit the crime for which he is on trial, but rather the testimony may only be considered by you for the limited purpose of determining whether it provides the complete story of the crime. That is, whether such testimony in the charged offenses are logically related or connected so that the testimony of the other tends to prove the one charged or is necessary for a complete account thereof. Okay.

> The record reflects that the trial court complied with the procedural requirements of Rule 404(b). At the jury-out hearing, the court determined, in part, that the evidence was contextual to the extent that it provided a complete story of the crime. With regard to contextual background evidence for which admission is sought pursuant to Rule 404(b), our supreme court has said:

> when the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant *only* to provide a contextual background for the case, the state must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

*State v. Gilliland*, 22 S.W.3d 266, 272 (Tenn. 2000) (emphasis added).

The *Gilliland* findings are "applicable only when the State seeks to introduce evidence for the sole purpose of establishing contextual background." *State v. Bruce D. Mendenhall*, No. M2018-02089-CCA-R3-CD, 2020 WL 2494479, at *26 (Tenn. Crim. App. May 14, 2020) (citing *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004)), *perm. app. denied* (Tenn. Nov. 12, 2020). However, the evidence was not offered by the State only to show contextual background for the present case, although the prosecutor referenced contextual background as "another school of thought" before the evidence was presented at the hearing. After the evidence was presented at the jury-out hearing, the State offered the evidence, and the trial court properly admitted it, to show the Defendant's motive, intent, and plan to avoid being implicated in the offenses. *See* Tenn. R. Evid. 404(b). Concealment of a crime is relevant to determining whether a killing was committed with premeditation and deliberation. *See Bland*, 958 S.W.2d at 660. As a result, the trial court did not abuse its discretion by admitting the evidence.

In reaching this conclusion, we have not overlooked the Defendant's argument that codefendant Autry's testimony at the jury-out hearing was not corroborated and that, as a result, the trial court could not have determined that the evidence was clear and convincing based solely upon the testimony of an accomplice. However, the Defendant does not cite to any legal authority requiring an accomplice's testimony be corroborated as a barrier to admissibility pursuant to Rule 404(b). Corroboration of accomplice testimony is an aspect of sufficiency of the evidence, not admissibility of the evidence. The court, as a matter of determining whether evidence is clear and convincing pursuant to Rule 404(b), determined codefendant Autry's credibility and determined his testimony was clear and convincing. We will not disturb this determination on appeal.

After codefendant Autry testified before the jury, the trial court instructed the jury that the evidence could not be considered to establish the Defendant's disposition to commit the offenses for which he was charged but could be considered for the limited purpose of determining whether it proved "the complete story of the crime," and "[e]vidence proving motive necessarily serves the purpose of completing the story of the crime." *Leach*, 148 S.W.3d at 58. The jury is presumed to have followed the court's instruction. *See State v. Williams*, 977 S.W2d 101, 106 (Tenn. 1998). The Defendant is not entitled to relief on this basis.

## B.    Rebecca Earp

The Defendant argues that the trial court erred by allowing Ms. Earp to testify about threatening statements the Defendant made "during a domestic assault," about a "criminal conspiracy between the [Defendant] and an acquaintance," and about "an attempt to destroy evidence." The State responds that the trial court did not err by admitting the

testimony. The State, likewise, argues that the defense failed to object contemporaneously to Ms. Earp's testimony related to the conspiracy and destruction of evidence and that, as a result, appellate review has been waived.

## 1.    Domestic Assault

The record reflects that during her testimony, Ms. Earp stated that in July 2011, she finally ended her relationship with the Defendant and that the relationship ended under "unpleasant circumstances." She testified that she and the Defendant argued and that she attempted to get away from the Defendant. When asked if the Defendant made statements at this time about the victim, the defense objected. Trial counsel stated, "I'm going to object if [the prosecutor] is trying to get into 404(b) evidence." The prosecutor stated that he was "asking for a statement, making statements." Counsel argued that even if the prosecutor were attempting to elicit testimony about the Defendant's statements, "it's not relevant to this, then I object to that coming in." The prosecutor stated that "it's about this. I'm asking her statements about [the victim]." Counsel requested a bench conference, but the trial court overruled the objection. The defense did not request a jury-out hearing. Ms. Earp continued her testimony, stating that during the argument, the Defendant stated, "[H]e said he would tie [Ms. Earp] up just like he did [the victim], and nobody would ever see [Ms. Earp] again."

Although the Defendant initially objected on the basis that Ms. Earp's testimony focused on the Defendant's other bad acts pursuant to Rule 404(b), the defense did not request a jury-out hearing as required by Rule 404(b)(1). In any event, the prosecutor clarified that he was attempting to elicit testimony about the Defendant's statements, not his conduct. As a result, Rule 404(b) was not implicated. The State offered the Defendant's statement as an admission by a party-opponent and was relevant to establishing the identity of the perpetrator, a critical issue for the jury's determination in this case because the Defendant denied any involvement in the offenses and attempted to implicate Mr. Britt as the most likely perpetrator. *See* Tenn. R. Evid. 803(1.2)(A), 401, 404.

Although the Defendant asserts that the statement was made during a domestic assault, Ms. Earp did not testify that the statement was made during a domestic assault. She testified that the relationship ended under "unpleasant circumstances," which involved arguing and her attempting to get away from the Defendant. The prosecutor did not ask, and Ms. Earp did not testify, whether the Defendant assaulted her. In fact, the record reflects that the prosecutor was careful to elicit limited testimony about the circumstances during which the Defendant's statement was made. The Defendant is not entitled to relief on this basis.

## 2.    Criminal Conspiracy and Attempted Destruction of Evidence

Ms. Earp testified that after her relationship with the Defendant ended, they continued to socialize.  She stated that "sometime after July" 2011, she overheard a conversation between the Defendant and Mr. Mitchell, who was the Defendant's friend. She heard the Defendant say that "everything was ready to go in the back of the truck to be put up under the Birdsong bridge."  She recalled that the Defendant said, "Take the Tupperware – it was a blue Tupperware thing to Birdsong."  She said, "They said it was the remains of [the victim].  But when they found out that I found about it, they said it was the remnants of making meth" that they were throwing away.  She did not recall if the Defendant or Mr. Mitchell mentioned the victim's remains.  She said that later, Mr. Mitchell told her that the incident was a "joke to see if [she] would call the police."

The record reflects that the Defendant did not object contemporaneously to Ms. Earp's testimony.  T.R.A.P. 36(a) ("Nothing in this rule shall be constructed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context[.]").  Likewise, in the motion for new trial, the Defendant alleged, without specificity, that the trial court erred by allowing Ms. Earp to testify "about other bad acts that the [D]efendant had committed."  At the motion hearing, the court noted that the motion for a new trial did not "allege where or how the [c]ourt erred with respect to this evidence," and the Defendant did not specify the bad acts for the court at the hearing. We conclude that appellate consideration of the issue is waived because the Defendant failed to object contemporaneously during the trial and failed to allege with specificity in his motion for a new trial that the court erred relative to Ms. Earp's testimony.  The Defendant is not entitled to relief on this basis.

## V.    Prior Inconsistent Statement

The Defendant contends that the trial court erred by excluding as irrelevant codefendant Autry's handwritten letter to trial counsel proclaiming the Defendant's innocence.  The Defendant argues that the court "stripped [him] of the ability to impeach the only witness to the crimes with which he was accused," resulting in substantial injustice and prejudice.  He likewise argues that the court violated his confrontation and due process rights by excluding the evidence.  The State responds that the court did not err by excluding the letter because it was irrelevant.  The State likewise argues that the Defendant has

-68-

waived appellate consideration of constitutional claims for his failure to raise the allegations in the trial court proceedings.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible unless it qualifies as an exception. *Id.* at 802. One such exception pertains to prior inconsistent statements of a testifying witness.

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded the opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admission of a party-opponent as defined in Rule 803(1.2).

Tenn. R. Evid. 613(b). A hearsay exception exists for:

> A statement otherwise admissible under Rule 613(b) if all of the following conditions are satisfied:
>
> (A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.
>
> (B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.
>
> (C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26).

A trial court's factual findings and credibility determinations relative to a hearsay issue are binding upon an appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that are reviewed de novo. *Id.*

During codefendant Autry's testimony, the State requested a hearing outside the presence of the jury and the media. After the jury was excused from the courtroom, a bench

conference was held, at which the State objected to the admission of a letter written by codefendant Autry on the basis of relevance. The State summarized that the letter was addressed to trial counsel and that it contained significantly unfavorable statements about the prosecutor. The court interjected and determined that the letter was not relevant to the present case. Counsel provided the letter to the trial judge, who read the letter from the bench. When the court asked for what purpose the defense sought admission of the letter, counsel stated that it was possible the parties could reach an agreement by redacting portions of the letter referring to the prosecutor. Counsel said that the relevant portion of the letter was that codefendant Autry stated that the Defendant was innocent but had testified at the trial that the Defendant was guilty of the charged offenses. The prosecutor stated that the solution was to ask codefendant Autry if he had previously asserted "all of the innocence, which he has. This is almost comical. And what I want is a copy of it." The court determined that the defense could ask codefendant Autry if he had ever written a letter to counsel claiming that the Defendant was innocent. The court permitted the defense to file the letter under seal as an offer of proof. However, when the cross-examination resumed, counsel did not ask codefendant Autry if he had written counsel a letter in which he claimed the Defendant was innocent.

The record reflects that the Defendant sought to admit the letter for the sole purpose of showing that codefendant Autry had previously claimed that the Defendant was innocent. Although the handwritten, signed letter reflects that codefendant Autry claimed the Defendant was innocent, the letter also largely contained irrelevant and unfavorable information about the prosecutor, which we note that the Defendant had suggested should be redacted. The trial court determined that the letter was irrelevant. However, the portion of the letter in which codefendant Autry asserted the Defendant's innocence was relevant to and probative of codefendant Autry's credibility, which was a critical issue for the jury to determine because he was the primary witness implicating the Defendant in the offenses. After the court excluded the letter, it was admitted under seal as an offer of proof. However, the Defendant did not request the opportunity to present an offer of proof to lay the proper foundation for a prior inconsistent statement and to establish what codefendant Autry would have testified. *See* T.R.A.P 36(a); Tenn. R. Evid. 103(a)(2). This court will not speculate. Nevertheless, the trial court permitted the Defendant to ask codefendant Autry if he had written a letter to trial counsel in which he claimed the Defendant was innocent. The Defendant, though, did not ask this question when the testimony resumed.

We note that in the motion the motion for a new trial, the Defendant alleged that the trial court erred by "not allowing the Defense to cross-examine [codefendant] Autry regarding a letter he mailed to Defense Counsel in which [codefendant] Autry made negative comments regarding the prosecutor." First, the defense did not seek to present any unfavorable evidence related to the prosecutor and offered to redact those portions of

-70-

the letter. Second, the trial court permitted the defense to cross-examine codefendant Autry about whether he sent trial counsel a letter in which he stated that the Defendant was innocent, and the record reflects that the defense did not. The Defendant did not allege in the motion for a new trial that the court erred by excluding the letter as a prior inconsistent statement. *See* T.R.A.P. 3(e); *see also Howard*, 504 S.W.3d at 277. As a result, the Defendant is not entitled to relief on this basis.

Likewise, the Defendant did not raise his constitutional allegations in the motion for a new trial. *See* T.R.A.P. 3(e). He, generally, argues for the first time on appeal that the exclusion of the relevant portion of the letter violated his confrontation and due process rights, although he does not cite to supporting legal authority. *See* T.R.A.P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b). In any event, the Defendant did not argue in the trial court proceedings that excluding the letter violated these constitutional rights. As a result, appellate consideration of the issues is waived for the failure to raise them in the trial court proceedings. *See* T.R.A.P 3(e), 36(a). The Defendant is not entitled to relief on this basis.

## VI.    Hearsay Evidence

The Defendant contends that the trial court erred by admitting hearsay evidence during the testimony of Trooper Rainey and codefendant Autry. The Defendant likewise asserts that admission of the testimony violated his confrontation rights. The State responds that the court did not err by admitting the evidence because it was not admitted for the truth of the matter asserted. The State also responds that appellate consideration of the constitutional claim has been waived for the failure to raise it in the trial court proceedings.

As a preliminary matter, in the motion for a new trial, the Defendant merely alleged, in relevant part, in connection with hearsay that the trial court (1) "erred in allowing the prosecutors to admit hearsay evidence because the prosecutors claimed the hearsay was not being offered for the 'truth of the matter'" and (2) "erred in allowing hearsay through the back door by allowing witnesses [to] testify about 'what happened next.'" The motion does not cite to any particular witness testimony, to the record, or to any legal argument. At the motion hearing, the trial court noted that the State's response was that the defense had not "alleged where or how" the court erred with regard to hearsay. The court stated that, during the trial, the court made rulings relative to hearsay objections and at times determined that a statement was not hearsay because it was not offered for its truth, "but that there were no specifics that I recall where there were objections." When asked if trial counsel had anything further, counsel responded, "No." In connection with "backdoor" hearsay, the trial court stated that it did not recall this during the trial but that a witness was permitted "to lay a basis for them doing what they did as opposed to it being actual

-71-

hearsay." When the court asked trial counsel if she had anything further, counsel responded, "No." Although the motion lacked specificity, we conclude that the record adequately reflects counsel's objections at the trial on the basis of hearsay during the testimony of Trooper Rainey and codefendant Autry, and we will consider the Defendant's allegations.

## A.     Trooper Rainey

The Defendant asserts that the trial court erred by allowing Trooper Rainey to testify about how he began investigating the Defendant because the substance of the testimony was "far too detailed and incriminating for admission."

The record reflects that soon after the offenses, Trooper Rainey asked "people for anyone who lived north of Parsons, who had been in trouble, drug user, sex offender, which I could look that up on the internet, which I did, and I would ask anyone and one of the names that came up was [the Defendant]." The defense objected on the basis of hearsay, and the State responded that it was not being offered for its truth and that it was offered to show why the trooper did what he did. The trial court overruled the objection and instructed the jury that the statement was not to be "consider[ed] . . . for the truth, it's just to explain the officer's actions."

We conclude that the trial court did not err in determining that the evidence was not inadmissible hearsay. Trooper Rainey testified regarding his investigation of the victim's disappearance, and the intended purpose of his testimony was not to establish that the Defendant was a drug user or sexual offender. The testimony reflected upon the trooper's investigation, and he testified that he focused on the area north of Parsons because of the cell phone data communications from the victim's cell phone on the morning of her disappearance and the locations where evidence was recovered throughout the investigation. Trooper Rainey explained that he drove the routes between the victim's home and the locations where evidence was recovered and that he ended in the Holladay and Yellow Springs communities, which led Trooper Rainey to the Defendant's home on Yellow Springs Road. *See State v. Miller*, 737 S.W.2d 556, 559 (Tenn. Crim. App. 1987) (Where a statement "is admitted into evidence merely to show the officer's reason for [a particular action during an investigation], the statement is admissible, because the testimony is not being offered to prove the truth of the matters asserted by the out-of-court declarant, and is clearly not hearsay."). The trial court provided a limiting instruction immediately following the trooper's statement, and the jury is presumed to have followed the court's instruction. *See Price v. State*, 589 S.W.2d 929, 931 (Tenn. Crim. App. 1979).

-72-

Further, the record is replete with evidence that the Defendant was a heavy drug user at the time of the offenses. We note that Ms. Earp and Mr. Dinsmore both testified about the Defendant's drug use before the victim's disappearance, and Mr. Darnell and Mr. Stateler both testified about the Defendant's drug use afterward. Codefendant Autry testified about the Defendant's drug use before and after the offenses. The record shows that while law enforcement focused on sexual offenders during the initial stage of the investigation, the Defendant, codefendants Autry and Adams, and Mr. Austin were not questioned during this time. The record supports the trial court's determinations, and the court did not err by admitting the evidence. The Defendant is not entitled to relief on this basis.

## A. Codefendant Autry

The Defendant argues that codefendant Autry's testimony that he went to his grandmother's barn "to clean up any possible evidence left behind" after speaking with codefendant Adams was inadmissible hearsay. He asserts that although codefendant Adams's "exact words . . . were assiduously avoided, the content of his assertion was clear, unmistakable, and highly prejudicial."

The record reflects that codefendant Autry testified that he accepted the Defendant's offer to kill codefendant Adams and that he intended to kill codefendant Adams while fishing on the Tennessee River. Ultimately, codefendant Autry abandoned his plan to kill codefendant Adams, and they fished and drank alcohol. Codefendant Autry testified that codefendant Adams became intoxicated and began to talk about the day of the offenses. The defense objected on the basis that codefendant Autry could not testify about what codefendant Adams stated, and the court sustained the hearsay objection. The court instructed codefendant Autry that he was permitted to testifiy about "what you did in response to it or what you said to [codefendant Adams] . . . but you can't say what [codefendant Adams] said to you."

The prosecutor asked codefendant Autry if codefendant gave him "certain information," and he responded, "That's correct. He gave me information as to the whereabouts of the rape --." At this point, trial counsel objected on the basis of hearsay, and the trial court sustained the objection. Codefendant Autry said that based upon their conversation about "April 13 and what happened," he "went to where the alleged rape . . . occurred --." The defense objected again, arguing codefendant Autry was testifying about where the alleged rape occurred. The court instructed the jury to "disregard what he said," and told the prosecutor to "get more directly to the point." Codefendant Autry stated that he went to his and Mr. Austin's late grandmother's barn on Yellow Springs Road, that he

went to the barn "some months" after the offenses to "clean up any possible evidence left behind," and that he did not see any evidence.

We conclude that the trial court did not err by determining that the evidence was not inadmissible hearsay. Codefendant Autry testified that upon learning information from codefendant Adams, he searched the barn to look for evidence related to the present offenses and to destroy any evidence. Although codefendant Autry initially stated that he went to where the alleged rape occurred, the trial court instructed the jury to disregard this statement, and the jury is presumed to have followed the court's instruction. *See Price*, 589 S.W.2d at 931. As a result, codefendant Autry did not testify about the codefendant Adams's statement. Rather, the testimony showed that based upon learning information, he went to a specified location to look for and destroy evidence related to a crime. The evidence did not contain out-of-court statements by codefendant Adams offered for their truth. The evidence shows codefendant Autry's conduct and cannot be inadmissible hearsay. We note that even if the jury inferred that codefendant Adams confessed to raping the victim inside the barn, this inference did not implicate the Defendant. The record supports the trial court's determinations. The Defendant is not entitled to relief on this basis.

## C.    Confrontation Rights

The Defendant argues that the testimony from Trooper Rainey and codefendant Autry violated his confrontation rights because he was unable to cross-examine the individuals to whom the trooper spoke during his investigation and to cross-examine codefendant Adams. However, the Defendant did not object contemporaneously on the basis that the testimony violated his confrontation rights. The record reflects that the only basis for objection at the trial was hearsay, and the Defendant did not raise the constitutional claim in the motion for a new trial. The Defendant is prohibited from raising this claim for the first time on appeal. *See Howard*, 504 S.W.3d at 277. In any event, the Confrontation Clause is not implicated when testimonial statements are not used for the truth of the matter asserted in the statement. *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004). As a result, appellate consideration of the issue is waived for the failure to raise it in the trial court proceedings. *See* T.R.A.P 3(e), 36(a). The Defendant is not entitled to relief on this basis.

## VII.    Impeachment Evidence

The Defendant contends that the trial court erred by excluding impeachment evidence of codefendant Autry's membership in the Aryan Nation gang. The Defendant asserts that the evidence was relevant to codefendant Autry's motive to fabricate his

testimony. The Defendant likewise argues that excluding the evidence violated his confrontation rights. The State responds that the court did not abuse its discretion by excluding the evidence after determining it was irrelevant and a "totally collateral issue." The State also argues that appellate consideration of the constitutional claim has been waived for the failure to raise it in the trial court proceedings.

Tennessee Rule of Evidence 607 provides, "The credibility of a witness may be attacked by any party, including the party calling the witness." Generally, "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility[.]" Tenn. R. Evid. 611(b). "[C]ross-examination is a fundamental right." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). "[A] denial of the right to an effective cross-examination is 'constitutional error of the first magnitude and amounts to a violation of the basic right to a fair trial.'" *Id.* (quoting *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980)). "The propriety, scope, manner, and control of cross-examination of witnesses, however, remain within the discretion of the trial court." *State v. Echols*, 382 S.W.3d 266, 285 (Tenn. 2012).

At a jury-out hearing, the State requested that the defense be prohibited from questioning codefendant Autry about his Aryan Nation membership. The Defendant argued that the gang had "88 truths," which included the "mantra that . . . you're not to rape white women," and that this gave codefendant Autry a motive to have "concocted this story" to exculpate himself in the rape of the victim. The Defendant asserted that if codefendant Autry was found to have raped a white woman, "he would suffer these horrible consequences in prison including possible death." The Defendant argued that codefendant Autry's motives "to do what he's doing" was an element of the defense and that the Defendant had a right to present a complete defense. Trial counsel stated that the defense theory was that another person was the guilty culprit and that the Defendant was innocent. The State argued that codefendant Autry's membership was not relevant to his credibility and that this case did not involve racial issues because everyone involved was white. The trial court determined that codefendant Autry's membership was irrelevant and found that the membership did not "tarnish his credibility." The court permitted the defense to impeach codefendant Autry's credibility but not relative to the Aryan Nation membership.

The defense was permitted to make an offer of proof, at which codefendant Autry testified that he was a member of Aryan Nation and that one of the rules of the gang prohibited the rape of white women. He agreed that if he were found to have raped the victim, he could face "great harm in custody." He also stated that he was prohibited from testifying in court and that his testimony was at his own peril.

We conclude that the trial court did not abuse its discretion by limited the cross-examination of codefendant Autry in this regard. Evidence of codefendant Autry's Aryan Nation membership had minimal, if any, probative value of codefendant Autry's credibility, which was the intended purpose of the evidence, and of whether the Defendant committed the charged offenses. However, the evidence was substantially inflammatory and could have been confusing for the jury. *See* Tenn. R. Evid. 401, 402, 403. Therefore, the evidence was inadmissible. The record supports the trial court's determination. The Defendant is not entitled to relief on this basis.

Regarding the Defendant's allegation that his confrontation rights were violated, the record reflects that the defense did not argue at the trial that excluding the evidence violated his confrontation rights. Furthermore, the Defendant merely alleged in his motion for a new trial that the trial court erred by not allowing him to question codefendant Autry regarding his Aryan Nation membership. At the motion hearing, the trial court found that the evidence was irrelevant and a "collateral matter." When the court asked if the defense had anything further on this issue, trial counsel stated, "No." The Defendant is prohibited from raising his constitutional claim for the first time on appeal. *See Howard*, 504 S.W.3d at 277. As a result, appellate consideration of the issue is waived for the failure to raise it in the trial court proceedings. *See* T.R.A.P 3(e), 36(a). The Defendant is not entitled to relief on this basis.

## VIII. "Witness Reactive Conduct Evidence"

The Defendant contends that the trial court erred by excluding evidence of Mr. Britt's "surprise" to cadaver dogs "hitting" on Mr. Britt's tools during a search of his property. The Defendant argues exclusion of the evidence denied the jury the opportunity to draw reasonable inferences relative to Mr. Britt's credibility and possible involvement in the offenses. The Defendant likewise asserts that excluding the evidence violated his due process rights. The State responds that the trial court did not err by excluding the evidence as irrelevant because Mr. Britt testified that he was not home when his property was searched by cadaver dogs. The State also argues that the Defendant has waived appellate consideration of the constitutional issue for the failure to raise it in the trial court proceedings.

The record reflects that when asked on cross-examination if cadaver dogs "hit on four tools" during the search of his property, Mr. Britt said, "I don't know what they hit on. I was in jail." Trial counsel asked, "Would it surprise you to know that cadaver dogs hit on --." The State interrupted, objecting on the basis of relevance, and argued that whether Mr. Britt was surprised was irrelevant. The trial court determined that the question was "improper" and sustained the objection. The defense continued its cross-examination

-76-

without requesting the opportunity to make an offer of proof. *See* Tenn. R. Evid. 103(a)(2) ("Error may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected, and . . . the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context."). This court will not speculate as to what, if anything, Mr. Britt would have testified.

In any event, Mr. Britt testified that he did not know what occurred during the search of his property because he had been in jail. "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Tenn. R. Evid. 602. Based upon the record before us, Mr. Britt lacked personal knowledge about what the cadaver dogs did during the search of his property. Therefore, the trial court did not abuse its discretion. The Defendant is not entitled to relief on this basis.

Regarding the Defendant's allegation that his due process rights were violated, the record reflects that the defense did not argue at the trial that excluding the evidence violated his due process rights. Further, he merely alleged in his motion for a new trial that the trial court erred by not allowing him to question Mr. Britt, who had been "the main suspect for years, regarding the fact that cadaver dogs hit on four tools found in Mr. Britt's shed." The Defendant is prohibited from raising his constitutional claim for the first time on appeal. *See Howard*, 504 S.W.3d at 277. As a result, appellate consideration of the issue is waived for the failure to raise them in the trial court proceedings. *See* T.R.A.P 3(e), 36(a). The Defendant is not entitled to relief on this basis.

## IX. Undisclosed Witness

The Defendant contends that "the trial court erred in not striking the 404(b) testimony of an undisclosed witness." The issue focuses on Mr. Clenney's testimony about his former wife's identification of the person she thought might have been driving the white truck a couple of weeks before the victim's disappearance. The Defendant argues, though, that the State's failure to provide notice that Mr. Clenney would testify deprived the defense of the ability to prepare adequately for cross-examination and prevented the defense from filing a motion to suppress to determine whether Ms. Clenney's identification was "so unnecessarily suggestive as to result in irreparable misidentification." The Defendant likewise argues that his due process rights were violated. The State responds that it disclosed as soon as possible to the defense that Mr. Clenney would testify, that the State did not act in bad faith, and that its late disclosure did not prejudice the defense.

"It is the duty of the district attorney general to endorse on each indictment or presentment, at the term at which the indictment or presentment is found, the names of the witnesses as the district attorney general intends shall be summoned in the cause[.]" T.C.A. § 40-17-106 (2018). The purpose of this requirement is "to prevent surprise to the defendant at trial and to permit the defendant to prepare his or her defense to the indictment." *State v. Allen*, 976 S.W.2d 661, 667 (Tenn. Crim. App. 1997); *see State v. Wilson*, 164 S.W.3d 355, 362 (Tenn. Crim. App. 2003). However, our supreme court has concluded that the statute "is directory only and does not necessarily disqualify a witness whose name does not appear on the indictment from testifying." *State v. Harris*, 839 S.W.2d 54, 69 (Tenn. 1992). Evidence should only be excluded "when the defendant is actually prejudiced by the failure to comply with the rule and when the prejudice cannot otherwise be eradicated." *State v. Kilpatrick*, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000). "It is not the prejudice which resulted from the witnesses' testimony but the prejudice which resulted from the defendant's lack of notice which is relevant." *Wilson*, 164 S.W.3d at 362. Relief is warranted only when a defendant establishes "prejudice, bad faith, or undue advantage" as a result of the State's delayed disclosure of a witness. *Harris*, 839 S.W.2d at 69.

When the State called Mr. Clenney as a witness, the defense objected. At a bench conference, the Defendant argued that the State was

> putting in some type of photo lineup, because my guess is that he's going to come in and say, she looked at photographs of different people at the police station, and that he recognized this photograph as being one of [the Defendant]. We don't have any kind of photo lineup. We don't know how suggestive this is. That's why a photo lineup these days are held under very strict regulations.

The State responded that a photograph lineup was not involved and that Ms. Clenney merely "flipped through" photographs at the police station. The Defendant argued that the State was attempting to admit a photograph array "through the back door" and that the defense could have filed a motion to suppress. The trial court overruled the objection.

The record reflects that Mr. Clenney accompanied Ms. Clenney to the Decatur County Sheriff's Department in order for her to review various "mugshots." He recognized "almost everybody" in the photographs as a result of his previous employment as a teacher. He said that although Ms. Clenney did not identify anyone as the person she had seen driving the white truck a couple of weeks before the victim's disappearance, she returned multiple times to the same photograph and stated the person in the photograph "fits the description" of the man. Mr. Clenney recognized the person in the photograph as the

Defendant. However, Mr. Clenney did not know that Ms. Clenney had previously identified another person as the driver of the white truck and had described the man as being in his early to mid-twenties, having light brown hair, and weighing 180 to 190 pounds.

After direct examination, the defense requested *Jenks* material, which the State said did not exist, and any notes from the prosecutor's interview. A bench conference was held, at which the prosecutor stated that he did not have any notes because he had spoken to Mr. Clenney "one time on the phone for maybe ten minutes, and I talked to him this morning for maybe [forty-five] seconds. That's the extent of it." The court concluded that the defense had received "everything."

At the conclusion of Mr. Clenney's testimony, the Defendant moved to strike his testimony because he was not disclosed as a witness to the defense before the trial. Trial counsel argued that the defense was unable to prepare properly for cross-examination and that the testimony contained evidence "of what we would characterize as 404(b) evidence." Counsel did not elaborate. The court overruled the motion without further discussion or explanation. The Defendant asked that the State confirm Mr. Clenney was not disclosed as a witness, and the trial judge stated, "He said he first talked with him yesterday afternoon very briefly and then maybe again this morning. So they've disclosed everything they could disclose, basically." The defense requested a mistrial, which the court denied without explanation.

As a preliminary matter, the State does not dispute that it did not provide notice to the defense that Mr. Clenney would testify. Although the trial court stated that the prosecutor had spoken to the witness the morning of his testimony and for ten minutes the previous day, the record reflects that the prosecutor did not state with specificity when he first spoke to the witness for ten minutes. As a result, the record does not reflect when the ten-minute discussion occurred.

In any event, the Defendant was provided notice that Ms. Clenney would testify and had ample opportunity before the trial to investigate the photographs shown to her by law enforcement and to file a motion to suppress in connection with her review of photographs. The record does not reflect that the defense filed a motion to suppress. Further, although the Defendant argues in his brief and at oral argument that a photograph lineup shown to her could have been unduly suggestive, the record does not reflect that she was shown a photograph lineup. Rather, Ms. Clenney looked at various "mugshot" photographs and was drawn to a particular photograph but could not identify the person in the photograph as the man she had seen driving the white truck. Mr. Clenney testified that the photograph to which she had been drawn depicted the Defendant. The defense cross-examined Mr.

Clenney and successfully established that Ms. Clenney had identified another person as the driver of the white truck and that she had previously described the man she had seen as having light brown hair and weighing 180 to 190 pounds. Other evidence showed that her description was inconsistent with that of the Defendant.

In his appellate brief, the Defendant initially frames the issue as the trial court erred by "not striking the 404(b) testimony of an undisclosed . . . witness." The Defendant, however, fails to explain the evidence he deems to be of a prior bad act pursuant to the Tennessee Rules of Evidence. In his motion for a new trial, the Defendant alleged that the trial court erred by allowing "a witness to testify regarding a photograph[] identification of the defendant. Materials were not provided to the Defense in discovery, and the defense was not given an opportunity to file a motion to suppress." At the motion hearing, the prosecutor explained that the Ms. Clenney testified about the identification process and that the defense was provided "her name, and had [a] description of what went on." The prosecutor likewise explained that "there was no photograph[] identification, . . piece of paper or anything like this, but Defense had her name and knew the subject of her testimony." When the court asked if the defense had anything further, trial counsel responded, "No." As a result, the Defendant did not allege a violation of Rule 404(b) in his motion for a new trial, and it appears from the record that the allegation in the motion for a new trial was relevant to Ms. Clenney, not Mr. Clenney. *See* T.R.A.P 3(e). We note, though, that the Defendant alleged a violation of Rule 404(b) at the trial, although counsel did not provide any factual or legal argument in support.

To the extent that the Defendant now argues Mr. Clenney's testimony that Ms. Clenney reviewed "mugshot" photographs implied that the Defendant had committed some prior bad act, the jury heard extensive evidence about the Defendant's flight and ultimate arrest by park rangers mere days before the victim's disappearance. The jury likewise heard extensive evidence of the Defendant's illicit drug use before and after the victim's disappearance.

Therefore, the Defendant failed to show that any prejudice resulted from the State's failure to include Mr. Clenney's name on the indictment. The trial court did not abuse its discretion by permitting the witness to testify and by denying the motions to strike and for a mistrial. The Defendant is not entitled to relief on this basis.

## X.     Cumulative Error Doctrine

The Defendant contends that he is entitled to a new trial due to the cumulative effect of trial errors. The cumulative error doctrine requires relief when "multiple errors [are] committed in the trial proceedings, each of which in isolation constitutes mere harmless

error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted); *see Jordan*, 325 S.W.3d at 79 ("'[T]he combination of multiple errors may necessitate . . . reversal . . . even if individual errors do not require relief.'") (quoting *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)).  The Defendant has not demonstrated that multiple errors occurred during the trial.  Without multiple instances of trial error to accumulate, the cumulative error doctrine does not apply.  Thus, cumulative error relief is not appropriate.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE